SCHAFF v. COPASS.   (No. 6732.)

(Court of Civil Appeals of Texas. Austin. April 17, 1924. Rehearing Denied May 7, 1924.)

1. **Railroads** ⬤⟐381(3)—**One sleeping on track guilty of contributory negligence.**

One falling asleep on railroad track is guilty of contributory negligence as matter of law, and cannot recover except on theory of discovered peril.

2. **Appeal and error** ⬤⟐930(1)—**Evidence and proper deductions viewed most favorably to plaintiff in determining sufficiency to support recovery.**

In determining sufficiency of evidence to support recovery, evidence and proper deductions therefrom must be viewed most favorably to plaintiff on defendant's appeal.

3. **Negligence** ⬤⟐83—**Discovered peril doctrine founded on public policy.**

Doctrine of discovered peril is founded on considerations of public policy, deduced from humanitarian principles, which impose moral duty on every one to avoid injuring another unnecessarily.

4. **Negligence** ⬤⟐83 — **Duty under discovered peril doctrine.**

Duty under discovered peril doctrine to avoid injuring another unnecessarily arises from immediate situation, and is entirely independent of causes which created it.

5. **Negligence** ⬤⟐83—**Ordinary care required under discovered peril doctrine.**

Only ordinary care in use of all means at hand consistent with safety of other measures responsibility under discovered peril doctrine, though such care consists of very high degree of diligence to avert injury; rules in negligence cases generally applying.

6. **Negligence** ⬤⟐83 — **Under discovered peril doctrine, actual discovery of peril must be shown.**

Under discovered peril doctrine, as in negligence cases generally, burden is on plaintiff to establish essential elements of liability, including actual discovery of, not mere duty to discover, immediate peril to human being.

⬤⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. Negligence ⬤➡83—Elements of negligence under discovered peril doctrine stated.**

To recover under discovered peril doctrine there must be evidence of sufficient probative force to warrant reasonable inference that peril was actually discovered, that object was recognized as human being, and that ordinary care in use of all means at hand was not exercised to avert injury.

**8. Railroads ⬤➡398(4)—Finding of discovered peril sustained.**

In action for injuries to one sleeping on railroad track, evidence *held* sufficient to support finding that fireman discovered him and recognized him as human being in time, by exercising ordinary care, to warn engineer in time for latter, by exercising ordinary care in use of means at his command, with due regard to passengers' safety, to avoid injury.

**9. Trial ⬤➡352(1)—Special issue as to discovered peril held not erroneous as not allowing for time necessary for fireman to warn engineer.**

In action for injuries to one struck by engine while sleeping on track, special issue as to whether defendant's employees, or any of them, saw perilous position of plaintiff and recognized him as human being, in time for them, or any of them, by exercise of ordinary care and use of all means at hand consistent with safety of train and passengers, to avoid striking plaintiff, *held* not erroneous as not allowing for time necessary for fireman discovering plaintiff to warn engineer in time for latter to act.

**10. Trial ⬤➡352(1, 5)—Special issue on discovered peril held properly refused as on weight of evidence and omitting consideration of facts in issue.**

In action for injuries to one struck by engine while asleep on track, special issue as to whether fireman discovered plaintiff on track and realized that he was human being in time, by exercise of ordinary care, to inform engineer in time for latter, by exercise of ordinary care, with means at hand, consistent with safety of train and passengers, to avoid striking plaintiff, *held* properly refused as on weight of evidence, and taking into consideration only conjunctive or collective acts of employees, though testimony raised issue of their individual acts, as fixing defendant's liability.

**11. Trial ⬤➡273—Parties must point out objections to charge before it is read to jury.**

Before charge is read to jury parties must point out objections to it, so that court may amend or correct it.

**12. Appeal and error ⬤➡1064(1)—Failure to make proper amendments and corrections of charge reversible error if substantially injurious.**

Failure to make proper amendments and corrections of charge on party's objections is reversible error if it results in substantial injury.

**13. Trial ⬤➡352(5)—Rule stated as to grouping of facts on submission of special issues.**

In submitting case on special issues, jury are not charged on law of case, and required to determine liability, as under general charge, but specific fact issues are submitted in form of questions, on jury's answers to which court adjudicates issue of liability, and same rule, as to grouping of facts, applies as that governing general charge.

**14. Trial ⬤➡352(1) — Test of correctness of special issue stated.**

Test of correctness of special issue submitted is whether affirmative answer would necessarily impose liability on defendant.

**15. Railroads ⬤➡390 — Discovered peril doctrine stated.**

To establish liability of railroad for injuries to one struck by engine while asleep in such position on track that only fireman could see him, discovery of his perilous position by fireman must have been in time, by exercising ordinary care, to warn engineer in time for latter, by exercising ordinary care, to avert injury.

**16. Trial ⬤➡194(17)—Charge that facts might be established by circumstantial or direct evidence, or both, held not reversible error.**

In action for injuries to one struck by engine while asleep on track, charge that any fact in issue might be established by circumstantial or direct evidence, or both, *held* not reversible error as comment on evidence.

**17. Evidence ⬤➡380—Picture advertising brilliancy of headlight held inadmissible in action for injury to person struck by engine.**

In action for injury to one struck by engine while asleep on track, picture advertising headlight represented as casting extraordinarily brilliant light on track for many hundred yards *held* inadmissible as not clearly showing relative distribution of light on different portions of track and its environs in certain respects.

**18. Appeal and error ⬤➡1050(1)—Admission of picture held not reversible error, in view of remote possibility that verdict was affected.**

In action for injuries to one struck by engine while asleep on track, improper admission of picture advertising headlight *held* not reversible error, in view of remote possibility that it affected verdict.

**19. Appeal and error ⬤➡1060(4)—Error in argument to jury held harmless in view of finding.**

In action for injuries to one struck by engine while asleep on track, error in permitting plaintiff's counsel to argue that it was porter's duty to see that there was nothing on track before giving engineer signal to proceed was rendered harmless by jury's finding that porter did not discover plaintiff before he was hurt.

Appeal from District Court, Bell County; Lewis H. Jones, Judge.

Action by Carl H. Copass, by Annie Stephens, as next friend, against C. E. Schaff, receiver of the Missouri, Kansas & Texas Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

C. C. Huff, of Dallas, Tyler & Hubbard, of Belton, and J. M. Chambers, of Dallas, for appellant.

---

Walker Saulsbury and Winbourn Pearce, both of Temple, for appellee.

McCLENDON, C. J. [1] This suit was instituted on behalf of Carl Copass by his mother, Mrs. Annie Stephens, as next friend, against C. E. Schaff, in his capacity as receiver of the Missouri, Kansas & Texas Railway Company of Texas, to recover compensatory damages for personal injuries sustained by Copass on the night of August 14, 1922, as a result of being run over by an engine operated by the receiver. Copass had fallen asleep while seated on the track, and therefore, under the doctrine announced in Railway v. Shiftlet, 94 Tex. 131, 58 S. W. 945, was guilty of contributory negligence as a matter of law, which precluded recovery except on the theory of discovered peril. The cause was tried to a jury upon special issues, who found that the fireman and engineer discovered Copass on the track in time, by exercising ordinary care, to avoid striking him, and assessed his damage at $20,000. The trial court rendered judgment in favor of plaintiff in accordance with these findings. The case is properly before us upon appeal from this judgment duly perfected by the receiver.

Fourteen propositions are urged by appellant as grounds for reversal. These propositions present the following contentions:

' First. That the evidence will not support any recovery.

Second. That the finding that the engineer discovered the peril of Copass in time to avert the injury was without support in the evidence.

' Third. That the second special issue was erroneous in various respects.

' Fourth. That appellant's second requested special issue was erroneously refused.

Fifth. That it was error to charge the jury that any fact in issue before them might be established by circumstantial or direct evidence, or both.

Sixth. That the court erroneously admitted in evidence a picture of an electric headlight shining down a railroad right of way.

Seventh. That certain remarks in the argument of plaintiff's counsel were prejudicial to defendant.

' We will consider these contentions in the above order.

[2] In deciding the correctness of the first contention, we must view the evidence and the deductions which may properly be drawn from it most favorably to the plaintiff. From this viewpoint we make the following statement of the evidence:

The occurrence happened a little after midnight, at a place known as Pershing switch, on the outskirts of the city of Austin, where the defendant's line of railway joins the Houston & Texas Central or Southern Pacific line. For convenience we will use initials in referring to the several railway companies. The S. P. line at this point runs east and west, and is used from the switch at Pershing west by the M., K. & T. trains. A public road crosses the S. P. track at right angles, immediately west of this switch. This road is tarviated, and about 40 or 50 feet wide. Immediately east of the road is a cattle guard, and just east of the cattle guard is the switch stand, which is situated on the left or north side of the track. From this point the M., K. & T. rails diverge from the S. P. rails toward the north and upon a curve. This curve is a continuation of a curve of the S. P. rails extending west from the switch for a distance of several hundred feet. It is a two degree curve, and practically uniform. The M., K. & T. north-bound trains leaving Austin over the S. P. line and passing on to the M., K. & T. line at Pershing switch travel east on the S. P. line until the engine reaches a point immediately west of the road in question, where the train is stopped; the porter goes ahead and throws the Pershing switch; the train then proceeds east across the road on to the M., K. & T. track; the porter boards the train when it reaches him; and the rear brakeman relines the switch, and then catches the rear car of the train, which is not entirely stopped, but slowed down, for this purpose. On the night in question Copass, a youth of 19 years, who lived at Temple, and who had just been discharged from the state militia, went out to Pershing switch for the purpose of stealing a ride to his home at Temple. He waited some time for a train, and finally crossed the cattle guard to the east of the road and sat down on the track, either at the frog, which intersects the north rail of the S. P. line and the south rail of the M., K. & T. line, or some 23 feet beyond the frog on the south M., K. & T. rail. In this position he went to sleep, and was not awakened until the train in question was practically upon him. He endeavored to get out of the way, but was not successful, and his feet were run over and mashed, resulting in serious permanent injuries. The train in question was a passenger train, consisting of 13 coaches. The engine was some 80 feet in length, the day coaches 60 and the sleepers 70 feet in length. The length of the entire train, exclusive of the engine, was about 900 feet. According to the engineer's testimony, the equipment upon the train was, as he expressed it, "100 per cent. efficient"; each coach was equipped with air, and the brakes in perfect order. The usual procedure above outlined was carried out in the instant case; the train was stopped just west of the tarviated part of the roadway, which placed the front of the engine approximately 75 feet west of the switch; the porter went forward and threw the switch and gave the signal to the fireman, who was on the left or north side of the engine, and he in turn gave the starting signal to the engineer. The porter testified

that he did not see anything on the track ahead of the train. The testimony of the fireman was to the effect that he was keeping a lookout ahead from the time the train started until Copass was struck, but that he did not see any object on the track until just at the time the front part of the engine was taking the M., K. & T. rails, at which time he saw an object on the track just passing out of his view behind the running board or front part of the engine. He also testified that he was keeping a lookout before the train stopped, but saw no object on the track. The following quotations give the substance of his testimony concerning his part in the affair:

"The picture you hand me I have seen before, and it correctly represents the situation there as I have seen it. About the time the engine was leaving the H. & T. C. track going onto the Katy track I saw something on the track ahead of us. The object that I saw on the track was in my view for just a little bit. The turning of the engine on the curve and the running board in front of the engine naturally got the object out of my sight in a very little bit. The turning of the engine made the engine come between me and the object. The object was indistinct, and it did not stand out clear. It was a small looking object to me —looked to be a very small thing. When I noticed the object on the track I hallooed to the engineer that there was something on the track, and then I went to his side. I would not be positive how far it was from where I was in the engine cab over to the engineer's side, but just about two steps, one down off.my box and then one across the cab; just the width of the cab. The engineer sits on one side of the cab and I sit on the other. I told the engineer when I got over to where he was that I thought there was something on the track. I attempted to see what it was from his side of the engine from out of the window, the gangway. I leaned out the gangway, and about the time I leaned out of the gangway I saw something run in front of the engine, and it was this boy, Carl Copass. The boy went over next to the H. & T. C. track, over to the right. He was dressed in soldier's clothes. When I saw the boy come in front of the engine I should judge that he was somewhere close to where the box is sitting on the track in the picture. I do not undertake to say that that is the exact point, but it was somewhere along there. Immiediately when I saw this object on the track I hallooed to the engineer, and I jumped right over to where he was, and told him again. I do not know whether he heard me when I hallooed or not, but anyway I went right over to where he was and told him again. The gangway is behind the engineer, between the tender of the engine and the engine itself. There was nothing that I could have done even if I had known that it was a person, other than what I did do. I could not have acted any quicker than I did."

On cross-examination he testified:

"I can see in the picture where the man is sitting on the frog. If this boy.had been on the frog that night while I was. looking out in that direction I think I would have seen him.

If he should have been at that place he would have been in my view looking down the track. I could have seen him, I think, while the engine was standing still and also when it moved forward. When I first saw the boy, or rather the object on the track, I immediately hallooed to the engineer. When I first saw the boy to recognize him to be a boy was after I had gone over to the right side of the engine and looked out of the gangway. I could not say just how close the boy was in front of the engine when I first saw him coming from in front of the engine, but it seems to me that he came out from about the head end of the boiler of the engine— looked like he came out from under the engine. He was sort of stooped over. It looked like he was on his all fours, but at that time he was in the dark of the engine. I did not get him mixed up at that time with a box or a dog, and knew that it was a human being notwithstanding he was in the dark of the engine and crawling. If he had been sitting out on the frog I do not know whether he would have been in the dark of the engine or in the light of the headlight. I don't know how far it is from the road crossing to the frog. I just stated a little while ago that if the boy had been on the frog I would have seen him after we had stopped the engine, and I still think I could. I can't say whether the light was shining on the frog or not. I can't tell you how far a light will shine in front of an engine. * * * I stated on direct examination that when I first saw the boy, or what I afterwards found to be a boy, was just at the time the front part of the engine was turning onto the switch and going onto the Katy track. That was about the time that I saw him. That is what I testified on the last trial. When the front part of the engine turned off of the Southern Pacific track and onto the Katy track is when I first saw the boy and hallooed to the engineer. That is as near. as I can trace the point. At that time I did not know that this was a boy, and I did not know what it was. After I told the engineer I had done all I could do to bring that train to a stop. I hallooed to the engineer and gave him such information as should have required him to have used every means in his power to stop that train. I have been running on a train as a fireman for about 12 years, and I have run an engine myself. I am not an extra engineer, but I have had 12 years' experience as a fireman. I know what the engineer's duty was with reference to stopping the train when I gave him the information that there was something on the track, and it was his duty to stop the train. I gave him such information that night, which was the same thing, I suppose, so far as stopping the train was concerned, as if I had hallooed to him that there was a boy on the track. The information I gave him should have required him to use all of the means within his power to stop that train immediately."

He further testified that the headlight was not as bright as usual on the night in question.

The testimony of the engineer, who was on the right or south side of the engine, was to the effect that he never saw Copass until after he was struck by the engine. We quote from his testimony:

"The way I first learned that there was any trouble was when the boy passed across on my side; I saw him. Just before we struck the boy the fireman said that there was something on the track; he did not know what it was; he was not positive. It seems to me that the engine passed over the switch at the time the fireman told me that he thought there was something on the track. I mean that the front end of the engine had passed the switch; that is the way it seems to me. The fireman said he thought there was something on the track, and I shut the engine off; we have a large lever that cuts the steam off the train, and I started to apply the brakes. I shut off the steam and I started to apply the brakes. When I started to apply the brakes the boy came across over to my side, and I saw the boy jumping along. I don't know whether he was hallooing or not. There is quite a lot of noise on one of those engines, and I could not say whether he was hallooing or not. When I saw him come out of my side of the train I made a stop. The boy had already gotten out from in front of the engine and out of danger from the engine when I first saw him; he was in the clear. I do not know, and could not be positive, as to how far we ran after I saw the boy come out from under the engine, but I think that we ran until the second baggage car got to about even to where the boy was, behind the engine."

He testified that on account of the curve it was impossible for him to see any one sitting on the frog or on the south rail beyond the frog from the engineer's side of the train, but he thought he could have seen the boy on the frog if the track had been straight. He estimates the distance from where the engine stopped to the frog at from 125 to 150 feet. Quoting further from his testimony:

"When the fireman told me that he thought there was something on the track I think that the cab of the engine was past the switch stand. I do not remember whether the cab had passed the switch stand for any considerable distance or not, but, as I testified on the former trial, I think that the cab was considerably past the switch the best I can remember. The cab had passed the switch for several feet. The cab of the engine must have been about halfway between the frog and the switch stand, as well as I remember. I do not know that we were past the switch point. I can't give you any definite figures on that; a man can't tell just the particular moment that he sees things. I am doing the best I can. It is my judgment that the cab of the engine had gotten several feet past the switch stand when the fireman told me about that. When the cab of the engine got several feet past the switch stand the fireman told me he thought there was something on the track; he passed over from his side to mine, and said he thought there was something on the track. He did not tell me what it was that was on the track, and he did not say what he thought it was. He did not say that he thought there was something out there, but he did not think it was a boy, and that it was not a woman, but did say that he saw something out there, but he did not know what it was. What he said to me, that he had seen something on the track but did not know what it was, did not convey the same meaning to me as if he had said that he saw a man on the track, and it did not cause me to stop in the same manner as I would have stopped if he had said there was a man on the track. Of course, when the fireman rushed over to me and told me that he thought there was something on the track I did not have the right as an engineer to speculate and say that I thought it was a piece of paper or a dog, but that did bring to my mind such notice as required immediate action. However, I do not think it should bring to my mind the same notice as if he had said there was a man on the track. When he told me that he thought there was something on the track I immediately shut my engine off. I acted on his information, just as though he had told me that there was a man. I shut off the steam from the engine. I did not see the boy come from under the engine, but I saw him look like he passed in front of the engine across on my side. I started to apply the air, but on a 13-car train it takes some little time to make a reduction, and I had just started to apply the air; I had not completed it when I saw the boy pass in front of the engine. At that time the boy had already been hurt. I started to apply the air before I saw the boy, just before he came across to my side of the train. I had already shut off the steam and was making the application of the air when I saw him. When I first saw the boy come from in front of the engine, it seemed to me that he was ahead of where the box is on the track that you show me in the picture, just about as far in front of the box as the box is in front of the frog; the box seems to be sitting about half the distance from the frog as the boy was when he came across the track and onto my side. If the box is 25 feet in front of where the frog is, I would say that the boy came across the track not as much as 25 feet in front of the frog, but I could not say just how far. I do think it was the other side of the box. I am not sure about that, but as well as I remember it seems to me that he came across the track in front of the engine further ahead of the frog than where the box is toward Temple."

None of the witnesses testified to the speed of the train at the time. The engineer, however, testified that he sped up the train as much as possible in order to get by the switch in the least time, when he had to slow up for the brakeman. He testified, however, that he could not have stopped the train in 75 feet at the rate of speed it was going when the fireman gave him the warning. With regard to ability to stop the train, he testified that if everything is favorable you should stop a train quicker when it has a large number of cars than a small number of cars; that it is harder to get a heavy train started and easier to get it stopped than a light one; that it is harder to start and easier to stop on a curve, and, of course, easier to start and harder to stop on a down grade. The grade at this point was slightly down, but the extent of the grade is not testified to.

Defendant's civil engineer gave the distance from the switch stand to the frog as

87½ feet. Copass was clad in khaki trousers and a blue shirt. He testified that he was sitting on the frog, and this testimony is corroborated by one Payton, who was at the time a watchman for the S. P., and when the accident happened was on the north side of the track west of the roadway. He did not see Copass on the track, but afterwards examined the premises and found part of a shoe just by the frog, and found the ground somewhat torn up immediately east of the frog, between the rails of the two roads. This witness further testified:

"I did not see the accident, but I did hear of it that night. The first that I knew that a man was run over, I heard some hallooing, but I thought it was some one on the inside, and the first I knew of it was when the fireman came to me and asked me if I had seen anybody—if I had seen anybody loitering around there—and he asked me how they were dressed, and I told him I had seen three or four; and he asked me if I had seen a man dressed in khaki; and I told him 'Yes'; and he wanted me to go down to identify the man, and I went down with him. I said, 'My God! you didn't run over a man as light as it was, and as slow as you were going; couldn't you see him?' and he said, 'Yes; I saw him, but I thought it was a yellow dog.'"

The claim agent of defendant made a test with the engine in question shortly after the accident. This test was made at night under conditions in which it was sought to reproduce as near as possible the situation at the time of the accident. The claim agent and, another employé of defendant had two or three days after the accident gone out to the place where it occurred, and found blood and pieces of clothing on and near the south rail of defendant's line 23 feet east of the frog, from which they concluded that Copass was sitting at that point when he was hurt. They placed a boy who was somewhat smaller than Copass at this point, and had him sit down upon the rail with his head between his knees. This boy was dressed in dark clothes. The engine was then moved east from just west of the roadway. Three persons were placed at different times in the fireman's and engineer's seats. These were W. H. Thaxton, C. E. Leonard, city engineer of Austin, and Harry Nolen, a civil engineer. Thaxton made two tests from the fireman's seat. In the first test the front of the engine or running board cut off his view of the boy when he was 41 feet west of the switch stand. In the second test by him the boy was shut off from view 34 feet from the switch stand. Leonard and Nolen testified that the boy passed out of their view at 47 feet west of the switch stand. This difference is explained by the witnesses as resulting from a slightly different position of the eye of the observer. Thaxton, it appears, was somewhat taller than the other witnesses, and it was in evidence that the fireman was somewhat taller

than Thaxton. All three of these witnesses, however, testified that at no time could either the frog or the boy be seen from the engineer's side of the engine. Both Thaxton and Leonard testified that from the point where the engine started to the point where the view was cut off by the front of the engine the boy seated 23 feet east of the frog was in perfect view from the fireman's box, his form was lit up by the engine headlight, and they could clearly distinguish at all times while he was in view that he was a human being; that the outlines of his figure were distinctly visible. Nolen's testimony was to the same effect, except that he could not tell that the figure was a human being, although it was plainly in view.

Plaintiff introduced witnesses who testified that the frog was in plain view from the engineer's side of the train, but these witnesses were standing on the ground by the side of the engine. A number of photographs were introduced in evidence in which appears a box placed on the south M., K. & T. rail 23 feet east of the frog. These photographs show several views taken from the fireman's and from the engineer's side of the engine. The same engine that figured in the accident was used in these photographs. They show that both the box and the frog were clearly visible from the fireman's side up to the point where these objects were cut off by the running board or front part of the engine, but that it was impossible to see the frog, the box, or any part of the south M., K. & T. rail from the engineer's side of the train.

Plaintiff introduced two witnesses who were expert locomotive engineers in the employ of the Santa Fé for many years, the effect of whose testimony was that if the train in question had been going at the rate of only four or five miles an hour it could have been stopped by use of the emergency brake in four or five feet, and by use of the service brake in about 15 feet, assuming the train to have been of the character testified to by defendant's engineer and having the equipment to which he testified. They also testified, in substance, that the train could not have gotten up a speed of more than 4 or 5 miles an hour in 75 feet, assuming that it was started and running on a two degree curve and slightly down grade. One of the witnesses, however, would not be positive that it was not possible, under such condition, to get the speed up to 15 miles an hour.

[3] The general principles which apply to the doctrine of discovered peril are now so thoroughly adjudicated in this state that a review of the decisions is unnecessary. The doctrine is founded upon considerations of public policy deduced from principles of humanity, and the motives which ought to actuate all rightly disposed members of society in their conduct toward fellow human

beings. The humanitarian principles invoked are those which impose a moral duty upon every one to avoid injuring another unnecessarily. Railway v. Breadow, 90 Tex. 31, 36 S. W. 410; Ry. v. Staggs, 90 Tex. 461, 39 S. W. 295.

[4, 5] The duty thus imposed arises out of the immediate situation, and is entirely independent of and aside from the causes which have created it. Generally speaking, the rules in negligence cases apply here. Ordinary care in the use of all means at hand consistent with the safety of others furnishes the measure of responsibility:

"In situations of such imminent peril the care of an ordinarily prudent person consists of a very high degree of diligence to avert injury, and the decisions discussing the question mean this rather than that more than ordinary care is exacted by law. That degree of care is all that any one owes to another, except when certain special relations exist." Railway v. Hodges, below.

[6, 7] Also, as in negligence cases generally, the burden is laid upon the plaintiff to establish the essential elements of liability. Among those elements is that of actual discovery of immediate peril to a human being; mere duty to discover does not raise the issue. The quantum of proof required to meet this burden is not essentially different from that generally required in other negligence cases. Consequently it is not a condition precedent to recovery that the party charged with being at fault admit that he actually discovered the peril, or that he recognized the object in the line of danger as a human being, or that he failed to do all in his power to avert injury; but it is essential that there be evidence of sufficient probative force to warrant the reasonable inference that the peril was in fact discovered, that the object was recognized as a human being, and that ordinary care in the use of all means at hand was not exercised to avert the injury. See Railway v. Shetter, 94 Tex. 199, 59 S. W. 533; Railway v. Ball, 96 Tex. 622, 75 S. W. 4; Railway v. Hodges, 102 Tex. 524, 120 S. W. 848; Railway v. Reynolds, 103 Tex. 31, 122 S. W. 531; Morgan v. Ry., 108 Tex. 331, 193 S. W. 134; Wilson v. Traction Co., 111 Tex. 361, 234 S. W. 663; Railway v. Trochta (Tex. Com. App.) 218 S. W. 1038; Baker v. Loftin (Tex. Com. App.) 222 S. W. 195; Railway v. Price (Tex. Com. App.) 240 S. W. 524; Railway v. Tinon (Tex. Civ. App.) 117 S. W. 936; Railway v. Broomhead (Tex. Civ. App.) 140 S. W. 820; Railway v. Jaramilla (Tex. Civ. App.) 180 S. W. 1126. (Writs of error were refused in the last three cases.)

[8] Applying these principles to the case at bar, we have reached the conclusion that the evidence is sufficient to support a finding that the fireman discovered Copass on the track and recognized him as a human being in time, by the exercise of ordinary care, to have warned the engineer in time for the latter, by the exercise of ordinary care in the use of the means at his command, and having due regard to the safety of the passengers, to have prevented striking Copass. While the porter was in position to see Copass, he testified that he did not see him, and the jury's finding supports his testimony. He may therefore be disregarded as a factor in the case.

We think the evidence conclusively establishes that the engineer could not, and therefore did not, see Copass until after he was hit by the engine. The only testimony to the contrary was that of plaintiff's witnesses who made tests from positions on the ground south of the engine. These tests were made under conditions not "substantially similar to those surrounding the occurrence"; and this evidence was not sufficient, we think, to overturn the positive testimony of the other witnesses and the photographic evidence, all to the same effect, and undisputed, that from the engineer's station in the engine Copass could not have been seen seated upon the south M., K. & T. rail. Baker v. Loftin, above. The duty of the engineer, therefore, only arose if and when he received the proper warning from the fireman.

That Copass could have been plainly seen by the fireman from the time the engine stopped west of the public road until the front of the engine cut off the fireman's view is established beyond peradventure. The fireman himself so testified. His denial that he saw him until just at the moment he passed out of sight behind the engine is not conclusive of that fact, in view of his own testimony that he was looking ahead in Copass' direction all the time. According to his testimony Copass passed from his view just as the front of the engine reached the switch. If Copass was on the frog he was then nearly 90 feet from the front of the engine. If he was where the box was placed, the distance was about 110 feet. The train had not moved above 75 feet from where it had last stopped, and the evidence will warrant a finding that the speed at the time was not in excess of 4 or 5 miles an hour. If at that time the fireman recognized Copass as a human being, a fact which he denies, then it can hardly be seriously questioned that a proper warning to the engineer and reasonably prompt action on his part would have stopped the train before Copass was struck. The jury had the right, we think, to draw these inferences from the evidence.

Nor do we think the testimony of the fireman that he did not recognize Copass as a human being at the time he was passing from view is conclusive of that issue. The evidence of two of the witnesses from tests made by the defendant was to the effect

that the form of a boy seated in the same position as Copass was clearly distinguishable from the fireman's seat. The latter had years of experience on an engine, and it was a part of his duties and training to discover and identify objects on the track. His testimony and that of the engineer are not entirely consistent on this point. For example, the fireman says he gave the warning to the engineer just as Copass was passing from his view and the front of the engine was then just passing onto the M., K. & T. rails. The engineer says, on the other hand, that when the warning was given the cab of the engine had passed the switch stand. Again, the fireman testified that immediately he saw the object he "hallooed to the engineer"; that he did all he could do, and could not have acted quicker had he known it was a human being; and that he gave the engineer "such information as should have required him to have used every means in his power to stop the train." Why should the fireman have acted with such haste and given such character of information, if he then thought the object was a yellow dog, as Payton quotes him as saying by way of excuse for the accident? This question was a proper one for the jury to raise in passing upon the evidence. The engineer at one place testified that he acted on the information given by the fireman "as if he had said there was a man on the track," and in another he admitted that on a former trial he had testified "that I did not apply the emergency but I would have applied the emergency if I had known there was a boy on the track." The train was not stopped until the front of the engine had run some 150 or more feet past where Copass was struck.

We do not think the testimony, taken as it is from interested witnesses, is of such character as to warrant withdrawal of the case from the jury, and we so hold.

[9, 10] In the following quotation Associate Justice Blair expresses our holding upon the third and fourth contentions:

"Complaint is made by appellant that the special issue submitted to the jury covering the question of discovered peril is erroneous. This special issue reads: 'Do you find from a preponderance of the evidence that the employees of the defendant, or any of them, saw the perilous position of such object on the track, and recognized such object as a human being, before it was struck by the engine, and in time that they, the employees of the defendant, or any of them, by the exercise of ordinary care in the use of all means then at hand, consistent with the safety of the train and those on the same, could have avoided striking the object? Let your answer be "Yes" or "No." ' The specific objection to this issue is that, as submitted, it makes no allowance for the time necessary for the employee discovering the object on the track to communicate such information to the engineer in time for him in the exercise of

262 S.W.—16

ordinary care in the use of all means at hand to have avoided striking the object, if the employee so discovering the object was other than the engineer. In this connection the appellant requested the submission of the following special issue: 'Did the fireman or porter discover Copass on the track in front of the engine and realize that he was a human being in time by the exercise of ordinary care to have informed the engineer of that fact in time that the engineer by the exercise of ordinary care in the use of all the means then at hand consistent with the safety of the train and passengers to have avoided striking Copass?'

"We do not think appellant's objection to the special issue submitted by the court tenable. Neither do we think the court erred in refusing to give the special issue requested by appellant. The court plainly asks the jury to answer from the evidence whether the employees of defendant, or any of them, discovered the perilous position of an object on the track, and recognized it as a human being, before it was struck by the engine, in time that the employees, or any of them, by the exercise of ordinary care in the use of all the means at hand consistent with the safety of the train and passengers thereon could have avoided striking such object. In other words, this issue left the jury free to determine from the evidence whether it was a fact that any one of appellant's employees, acting alone in his line of duty, or all of appellant's employees, or any number of them, acting conjunctively or collectively, in their respective lines of duty, in directing the movements of the train or engine in question, discovered the object on the track and recognized it as a human being in time, by the exercise of ordinary care in the use of all means then at hand, whether acting individually or jointly, in the use of such means, could have avoided striking the object. The use of the term 'by the exercise of ordinary care' as used in the special issue complained of plainly relates to all appellant's employees, whether acting individually of collectively in controlling the movements of the engine. The use of the term 'in the use of all means then at hand' as used in this issue plainly relates to all of appellant's employees, whether acting individually or collectively, in the use of all means at hand in controlling the movements of the engine. Now, assuming that the employees or any one of them saw the object on the track and recognized it as a human being, then the court asked the jury to determine for it the fact of whether or not the employees, acting either individually or collectively, by the exercise of ordinary care in the use of all means then at hand, could have avoided striking the object on the track. The question of how or in what manner or the time it took the employees, acting individually or collectively, 'in the use of all means at hand,' became mere matters of evidence from which the jury were to find the fact elicited by the issue. This being true, if the jury should have believed from the evidence that appellant's employees, or any one of them, discovered the object on the track and recognized it as a human being in time to have avoided striking it by the exercise of ordinary care in the use of all means at hand, whether the employees acted individually or collectively, and, further, that said employee or employees failed to use all means at hand

(which means at hand included signals or warnings by any employee seeing the object to the engineer, as well as the use by the engineer of all appliances with which he could stop the engine as in case of emergency), then the jury must answer the issue in the affirmative, and so answering it imposed liability upon appellant. The evidence as above detailed would certainly support the jury's finding that the fireman saw the object, but failed to give the signal to the engineer, or failed to give the proper signal. Likewise would it support the finding that if they believed the fireman gave the proper signal the engineer failed to obey it, which, in either event, would fix liability upon appellant.

"The special issue requested by appellant was properly refused because it was inclined to be a charge upon the weight of the evidence, and because it only took into consideration the conjunctive or collective acts of the employees as fixing liability, whereas the testimony raises the issue of the individual acts of the employees as fixing liability of appellant."

While the writer has some doubt as to the correctness of this interpretation of the language employed in these two special issues, he is not so confirmed in his views as to formally dissent. Language is, at best, only an imperfect vehicle for conveying thought; and even the most eminent authorities disagree at times as to the exact shade of meaning which some particular sentence conveys. Ambiguity is not always avoided by even the most accurate writers.

[11, 12] Under our present practice act the parties are required before the charge is read to the jury to point out any objections they may have to it, so that the court may amend or correct the charge, if the objection be valid. It is the duty of the court to make all proper amendments and corrections, and a failure to do so is reversible error if it results in substantial injury to the complaining party.

[13] In submitting a case upon special issues the jury are not charged upon the law of the case, and required to determine liability, as under a general charge; but specific issues of fact are submitted in the form of questions and upon the jury's answers the court adjudicates the issue of liability. The same rule regarding grouping of facts under a general charge applies to special issues. Fox v. Hotel Co., 111 Tex. 461, 240 S. W. 517.

[14, 15] The court's special issue No. 2 was the only issue submitting the facts from which liability could be determined. The test of the correctness of that issue is whether an affirmative answer to it would necessarily impose liability upon defendant. As we have held above, the engineer could not possibly have seen Copass before he was injured. He could only discover the peril by warning from some other employee. The fireman and porter were the only employees in position to have seen Copass, and the jury's verdict, by eliminating the porter, narrows the issues involved to whether the fireman discovered the peril in time to warn the engineer, who alone had control of the engine, in time for the latter to avoid the injury.

It is not contended that any one but the engineer had physical control of whatever instrumentalities could have been employed to avert the injury. It is clear from the authorities above cited that, as regards the means which each of these employees had at his disposal to avoid injuring Copass, the duty was only to exercise ordinary care in their use. To this extent the duty of each was qualified, not absolute. To support liability the discovery by the fireman must have been in time by exercising ordinary care to warn the engineer in time for him, by exercising ordinary care, to avert the injury. Does an affirmative answer to the issue as given necessarily amount to such finding? Does the charge necessarily apply the element of ordinary care to the action of both (all) the employees required to act, or only to both (all) or either (any) of them? A finding that one by the exercise of ordinary care could have prevented the injury would not impose liability, unless the necessary co-operation of the other was qualified by the same test of ordinary care. The duty of neither was absolute. If an affirmative answer to the issue would be supported by a finding that the fireman discovered Copass as a human being at a time when it was physically possible for him to warn the engineer in time for the latter by exercising ordinary care, etc., to avoid injury, the duty of the fireman would be made absolute. He did give the engineer some sort of warning. Did he give the proper warning? If not, was his dereliction the result of a failure to exercise ordinary care. Does the jury's answer necessarily resolve the last question? The time between the discovery of the peril and the striking of Copass must, to create liability, have been sufficient to prevent the injury by the combined efforts of both fireman and engineer, each fulfilling no more than the measure of his legal duty; and, if the issue was defective in this regard, it was affirmatively erroneous. The writer merely states the questions involved in the contentions of appellant relative to the issues given and refused.

[16] Upon the authority of Railway v. Munn, 46 Tex. Civ. App. 276, 102 S. W. 442, in which writ of error was refused, we overrule the fifth contention that it was reversible error to charge the jury that any fact before them might be established by circumstantial or direct evidence, or both.

[17, 18] We think the picture referred to in the sixth contention was clearly inadmissible. This picture was an advertisement of a certain kind of headlight, and repre-

sented "the headlight of an engine casting an extraordinarily brilliant light upon a track for many hundred yards." The several witnesses who testified concerning the picture admitted that in one or more respects it did not correctly show the relative manner in which an electric headlight distributes the light on different portions of the track and its environs. Whether admission of the picture in evidence should require a reversal of the case depends upon its probable effect upon the verdict. We have reached the conclusion that, in the light of the entire record, the possibility that the evidence affected the verdict is too remote to warrant setting it aside.

[19] The complaint in the seventh contention, above, is that "it was error for the court to permit the plaintiff's counsel in his argument to tell the jury that it was the duty of the porter to see that there was nothing on the track before giving the engineer the signal to proceed." This error was rendered harmless by the jury finding to the effect that the porter did not discover Copass before he was hurt.

The judgment of the district court is affirmed.

Affirmed.