**WEST et al. v. CASHIN.**

No. 10080.

Court of Civil Appeals of Texas. Galveston.

April 26, 1935.

Rehearing Denied May 30, 1935.

Platt, West & Stevenson and Fulbright, Crooker & Freeman, all of Houston (J. A. Platt, Jno. H. Freeman, and Lester Settegast, all of Houston, of counsel), for appellants.

B. F. Louis, Murray G. Smyth, and Jeff D. Farish, all of Houston, for appellee.

LANE, Justice.

This suit was brought by D. M. Cashin against J. M. West, West Production Company, and H. R. Cullen to recover for a commission or compensation for certain services alleged to have been rendered by him in assisting the defendants in making a sale of defendants' one-half interest in oil properties known as the Lockwood Dome, sometimes called Thompson's Ridge or Rabb's Ridge; it being alleged that such assistance was rendered at the request of J. M. West for defendants.

Plaintiff further alleged that on and prior to November, 1931, he was and is still engaged in the business of procuring purchasers for and making sales of oil, oil royalties, oil leases, and oil lands for others and in making and preparing reports and appraisals of such oil properties; that J. M. West represented to him that he (West) together with H. R. Cullen owned one half of the Lockwood Dome property and the other half was owned by the Gulf Refining Company; that he (West) employed plaintiff in selling and assisting in the sale of said properties owned by himself and Cullen; that under such employment plaintiff began negotiations for the sale of said properties; that plaintiff advised West that it was necessary to have a geological report and appraisal of the land in order to make a sale of the properties; that upon such advice West, on behalf of himself and his codefendants, made and entered into the following verbal agreement with plaintiff:

"(1) That plaintiff prepare a geological report and appraisal upon said properties. (2) The plaintiff was authorized to sell the interest of defendant and his co-defendants in said Lockwood Dome properties. (3) That if the plaintiff obtained a purchaser to whom such properties were sold, that defendant would pay plaintiff the ordinary broker's commission for such sale. (4) That in the event a sale of such properties was made to a purchaser other than one procured by plaintiff, and in the sale to whom plaintiff's assistance was invoked by defendant, that defendant would pay plaintiff what would be a fair commission under all the circumstances for his services in assisting in such sale, which commission, it was agreed, should be less than the ordinary broker's commission paid in cases where the broker made a sale to a purchaser procured by him. (5) That upon the completion of said report and appraisal, plaintiff would be paid by defendant the sum of One Thousand Dollars ($1,000.00), which would subsequently be deducted from any commission earned by plaintiff, and that if a sale was made of the properties by defendants to a purchaser not procured by plaintiff and in the sale to whom plaintiff was not called upon by defendants to assist, whether or not such sale was made before the completion of such report and appraisal by plaintiff, that plaintiff would then be paid the sum of One Thousand Dollars ($1,000.00) for his work thereon.

"That in pursuance of said agreement plaintiff completed said report on about the 11th day of January, 1932, and, in view of the increased cost and expense thereof, by reason of delays occasioned by defendants, their agents and employees, in failing to furnish plaintiff with necessary data and on account of necessary added costs of drafting and blue-printing of maps and sections and other details, which had not been estimated by plaintiff and defendant in determining the cost of such report and appraisal, defendant, J. M. West, agreed to and did pay to the plaintiff the said sum of One Thousand Dollars ($1,000.00) and the added amount of Three Hundred Dollars ($300.00), or a total of Thirteen Hundred Dollars ($1300.00) at which time said report was delivered by plaintiff to the said defendant, J. M. West."

Plaintiff further alleged that West, acting for himself and his codefendants, requested plaintiff to assist defendants in making a sale of said properties to the Humble Oil & Refining Company, and that upon such request he did assist in making such sale which subsequently took place; that the consideration paid by the Humble Company was $3,000,000 in cash, and $17,000,000 to be paid out of oil, and a further consideration of an overriding royalty in the oil, gas, and sulphur produced from the Lockwood Dome properties; that by reason of the premises defendants became bound to pay the plaintiff $500,000, which would be a fair compensation under all the circumstances, though less than the ordinary broker's commission in a case where the broker procured a purchaser; that a fair compensation under the circumstances of this case would be $500,000, by reason of the assistance given by him in the sale of the properties.

Plaintiff's prayer was for a recovery of the sum of $500,000 and interest thereon from the 10th day of March, 1932, until paid.

Defendant J. M. West answered for himself and West Production Company by a general demurrer and general denial.

Defendant H. R. Cullen answered by general demurrer, general denial, and specially averred that the agreements alleged by the plaintiff were not made by him nor by any one authorized by him to make the same; that if such agreements were made they were without his knowledge or consent; and that he has not ratified or confirmed same.

After all parties had rested, the court, upon motion of defendant H. R. Cullen, directed a verdict in his favor and upon the return of such verdict judgment was rendered for him.

The controversy as between the plaintiff and defendant West was submitted to the jury upon special issues in answer to which this jury found: (1) That the defendant J. M. West agreed with the plaintiff, D. M. Cashin, that in the event a sale of the Lockwood Dome properties known as the Cullen and West properties was made to a purchaser other than one procured by the plaintiff, and plaintiff's assistance was invoked by the defendant West, that the defendant West would pay plaintiff what would be a fair commission under all the circumstances for his services in assisting in said sale. (2) That J. M. West, on or about March 10, 1932, invoked the services of plaintiff, Cashin, to assist in making sale of the Lockwood Dome properties to the Humble Oil & Refining Company. (3) That plaintiff rendered services in assisting in making the sale of the properties in question to the Humble Oil & Refining Company. (4) That $25,000, if paid in cash on April 1, 1932, would be a fair and reasonable compensation for plaintiff's services, if any, in assisting in the sale of the West Production Company's one-fourth interest in the Lockwood Dome properties. (5) That the plaintiff, Cashin, did not agree with defendant J. M. West that in consideration of the $1,300.59, paid by West for the geological report made by Cashin on the Lockwood Dome properties, that he (Cashin) would explain said report and its contents to West, or his associates, or to any prospective purchaser of said properties without additional compensation.

Upon such findings the court rendered judgment in favor of the plaintiff, D. M. Cashin, against J. M. West and the West Production Company for the sum of $25,000, with interest thereon at the rate of 6 per cent. per annum from the 1st day of April, 1932, until paid, and from such judgment J. M. West and West Production Company have appealed.

By appellants' proposition No. 1 they contend that there was no evidence to support the judgment rendered, such contention being based upon the further contention, as shown by propositions 2, 3, 4, 5, and 6, that plaintiff sought a recovery only as a broker, and that the undisputed evidence shows that plaintiff did not act as a broker nor perform any service as such broker in connection with the sale involved; such services as he rendered being merely incidental services in explaining, as a geologist and engineer, a geologic report and map previously made by him, and paid for by West. Wherefore, the court erred in submitting to the jury special issues 4 and 5 inquiring as to the reasonable value of plaintiff's services.

We overrule appellants' contentions. As already stated, plaintiff alleged that J. M. West, for himself and his codefendants, made and entered into a verbal agreement with him whereby it was agreed that if plaintiff obtained a purchaser to whom said properties were sold, that defendants would pay plaintiff the ordinary broker's commission, but if a sale of the properties was made to a purchaser other than one procured by plaintiff, and in the sale to one whom plaintiff's assistance was invoked by West, that defendants would pay plaintiff what would be a fair compensation under all the circumstances for his services invoked by West, in the negotiations relative to the sale of said properties, not as a broker, but for services rendered only. There was no claim for compensation as a broker, as contended by appellants. We think there was ample evidence to support the judgment rendered.

Cashin, testifying relative to the agreement entered into between himself and J. M. West, said:

"I told him (West) I would prepare this report and appraisal with the idea and with the understanding that I would have the sale of the property to anybody with whom I had contact and in the event he sold it to somebody whom he contacted, I was to get a fair broker's commission, and that he could deduct from this commission paid me the cost of the preparation of the report, but if he sold to somebody with whom he was in contact and I assisted in the trade, he would give me a

commission which would be less than the ordinary broker's commission, and that he could deduct from it the amount he would pay me for the preparation of this report and in the event he sold it to somebody I did not contact or did not assist in the sale, I was still to be paid the amount for the preparation of my report.

"He said he decided to have me make the report and that he would pay me $1000.00 for making the report, with the understanding that it was to be deducted from any commission paid me. He said he had been in contact with the Gulf, Humble and Sinclair, and he said 'In the event you assist in the trade you will be paid less than the ordinary broker's commission, and if you sell the property to the people with whom you are in contact you will be paid the ordinary broker's commission and I will deduct the $1000.-00.'"

It was shown that after Cashin delivered to West the geological report involved in this case and after he was paid therefor, West was trying to sell the properties involved in this case to the Humble Oil & Refining Company, and to do so he was to have a conference with Mr. Pratt, purchasing agent for the Humble Company. On the day before said conference was held, West told Cashin that he (West) would probably call Cashin in the next day to assist him in the anticipated negotiations with Pratt. Relative to the interview just mentioned Cashin testified: "At the same interview Mr. West stated to me he would probably call me in to assist in the Humble trade and he asked if I would be in my office the following day, and I told him I would, but I was figuring on leaving close to noon and going to Beaumont, and he said 'You stay there until eleven-thirty, I will call you if I need you,' *and we started discussing a commission,* and I said I discussed commission with you several times, and when the trade was consummated we would settle the commission, and he said 'I have been in contact with the Humble Oil & Refining Company to reopen this trade, and I think you would be entitled to a commission less the regular commission because I am in contact with them,' and I said 'I asked you to set it several times, and you said we would wait until the trade is consummated,' and I said 'I will abide by it and you can set it when it is consummated,' that is all that happened that day."

Cashin testifying further said: "Mr. West said: 'We want you to discuss this property with Mr. Pratt and go into the matter. He wants to discuss it with you and I am going out of the room for awhile. You folks go ahead and discuss it.' And I sat down and went over the property and Mr. West left the room."

Testifying as to conversations had between himself and West on the day of the conference with Pratt, appellee Cashin said: "Mr. West phoned me that same morning and asked me to come to his office and I did, and when I came in he told me I had been of very material assistance in closing with the Humble Oil & Refining Company. He said 'we traded, and you have been of very material assistance in closing the trade,' and he said 'you did not make any money on this amount we gave you, and it is intended you should be compensated in the event of a sale,' and he said, 'What do I owe you in the way of a commission?' And I said, 'I spoke to you several times about arranging a commission, and you said you would set it when the trade is consummated, and the trade is consummated, I think it is up to you to set it.' And he said I would have to set it, and I said, 'No, I think it is up to you.'"

Witness Pratt testified that he could not recall in detail all the conversation that took place before West left the room or after he returned, but he brought out by questions to Cashin, or Cashin brought out by making the statement, his conception of the proven area and probable productivity of the field they were discussing, and showed him (Pratt) figures as to what profit might be expected from the operation of the field under certain assumptions; that Cashin showed him the map with the wells on it and an outline of the area in which oil might be expected, or area which was proven for oil, and in which oil might be expected to be produced; that such, he thought, about covered the conversation while West was in the room.

Following the testimony of Pratt as above stated, Pratt testified as follows:

"Q. In those assumptions that Mr. Cashin was making as to the area of the field and the productivity of it was reflected by the report he had and the maps? A. Yes, sir.

"Q. In making those statements or assumptions that you have testified about,

was he explaining to you the map, or was he making them outside of what was reflected in the map and report? A. They were reflected in the map, and the report in so far—I think entirely. They were in explanation of the map and report, with perhaps some argument justifying this or that conclusion that was set out in the report.

"Q. All right, what happened then, Mr. Pratt? A. Shortly after Mr. Cashin came, Mr. West left the office, and he said for us just to go ahead, and for Mr. Cashin to explain the map and report to me, and that he would be back. Mr. Cashin and I proceeded and got pretty well through before Mr. West came back.

"Q. I will ask you, Mr. Pratt, if anything was said by Mr. Cashin there in Mr. West's office at that time to you, or to Mr. West, other than in explanation of the map and report that he had previously furnished to Mr. West and stating how he arrived at these conclusions? A. Nothing that I recall beyond the explanation of the report during the time that Mr. West was in the office.

"Q. Nothing was said about your making any money out of it on the basis of what he said about a possible profit? A. Yes, sir, he told me he thought we would make one hundred per cent profit if we bought at a certain price.

"Q. What price was that, Mr. Pratt? A. I think it was nineteen million dollars.

"Q. That you could make one hundred per cent? A. The report will show—whatever the report shows.

"Q. That you could make one hundred per cent profit on the basis of that report? A. I think he had a figure set up there showing what basis you could buy the property at and make one hundred per cent profit on.

"Q. You were impressed with the idea that Cashin was trying to sell you on the property? A. Yes, sir.

"Q. He was doing everything he could as far as you could see to make it look attractive to you? A. Well, yes, sir."

Cashin also testified as follows: "Mr. West asked me to discuss Lockwood Dome, its possibilities, production and so on, and price, with Mr. Pratt, and then he excused himself and left the room, and so I proceeded to talk to Mr. Pratt and discuss those things, and after we had gone into the reserves, appraisal, and method of arriving at it, lifting charges, cost price, possibilities of trade, and so on, why, Mr. West came back in the room, and then after talking about the area for some time, I asked Mr. Pratt to leave the room, and then discussed with Mr. West the price and a possible formula for making the trade."

■ Considering the probative evidence supporting the verdict of the jury and the judgment rendered alone, as we are required to do, we hold that there was an abundance of evidence to support such verdict and judgment.

■ Appellants are insisting by their sixth proposition that there was no evidence by which the value of any services rendered by Cashin could be measured, insisting that the only evidence relative to the value of Cashin's services related to value of brokerage services, while the undisputed evidence shows that Cashin did not render brokerage services, but only incidental services as a geologist and engineer; there being no proof as to the value of services of the character shown by the evidence.

We overrule such contention. Neither by the pleadings nor the evidence of the plaintiff is this cause reduced to a "procuring cause" case. The plaintiff did not plead that he was employed to procure a purchaser, but he does allege and prove that he was promised by West a fair compensation under all the circumstances for his services invoked by West; that it was agreed that such compensation, however, should be less than the ordinary broker's commission paid in cases where the broker was the procuring cause. The evidence shows that the sale of the properties was for a consideration of about $20,000,000, and we think the finding of the jury under all the facts shows that a fair compensation for appellee's services was $25,000.

■ Special issues 3, 4, and 5 submitted by the court are as follows:

No. 3. "Do you find from a preponderance of the evidence that the plaintiff, D. M. Cashin, on or about March 10, 1932, rendered services in assisting in making the sale of the Lockwood Dome properties to the Humble Oil and Refining Company?"

No. 4. "What sum of money do you find from a preponderance of the evidence, if paid in cash on April 1, 1932, would be a fair and reasonable commission or com-

pensation for plaintiff D. M. Cashin's services, if any, in assisting in the sale of the West Production Company's one-fourth interest in the Lockwood Dome properties?"

No. 5. "What sum of money do you find from a preponderance of the evidence, if paid in cash on April 1, 1932, would be a fair and reasonable compensation for plaintiff D. M. Cashin's services, if any, in assisting in the sale of the Cullen & West one-half interest in the Lockwood Dome properties?"

By appellants' propositions 7 to 10, inclusive, it is urged that the trial court committed reversible error in submitting special issues 3, 4, and 5, in that such issues were charges upon the weight of the evidence; that they are an assumption that plaintiff did assist in making the sale of the properties involved in the case to the Humble Oil Company; that they were so worded as to indicate to the jury that the court was of opinion that plaintiff had assisted in making the sale; and that the only fact for their determination on the issues was as to plaintiff's services, and as worded the jury was prevented from returning a negative answer thereto.

We overrule such contention. By special issue No. 2 the court asked the jury to find from the preponderance of the evidence whether or not plaintiff, Cashin, rendered services to assist in making the sale of the properties involved. The answer to such inquiry was: "We do."

We are not prepared to hold that the submission of the special issues complained of, or any of them, constitutes reversible error, after reviewing all the special issues Nos. 1 to 5, inclusive. In reading such issues the jury could not have reasonably been misled to believe that the trial court thereby indicated a belief that the court was of opinion that Cashin rendered services to assist or in assisting the sale of the properties in question.

■■■■■ We here adopt as our own the views expressed by the appellee in his brief, as follows:

"It is a familiar rule that a charge to a jury will be considered as a whole in determining such questions as whether or not it is misleading, upon the weight of the evidence or otherwise erroneous. It will be construed in view of the issues made by the pleadings and the evidence; and the words employed in instructions and issues

must be taken in the ordinary and popular acceptation. The language will be given the plain, common-sense meaning it was evidently intended to convey when considered in the light of the charge as a whole, and one part of the charge may be looked to for the purpose of qualifying another. The cases are too numerous to review. The following are examples of cases where, as here, the claim was that a certain instruction or issue was misleading or upon the weight of the evidence. They are cases in which the appellate court held that it would look to the whole charge and the facts and issues of the case to determine whether or not the charge was misleading or upon the weight of the evidence, and in which having examined the issues complained of in the light of the whole charge, the appellate court found that there was no error: East Line & Red River Ry. Co. v. Smith, 65 Tex. 167, 170; Fort Worth & R. G. Ry. Co. v. Ross (Tex. Civ. App.) 54 S.W.(2d) 561, writ of error refused; McClung Construction Co. v. Muncy (Tex. Civ. App.) 65 S.W.(2d) 786, writ of error dismissed; Texas Indemnity Ins. Co. v. Wingo (Tex. Civ. App.) 47 S. W.(2d) 397, writ of error dismissed; Irvin v. Drake (Tex. Civ. App.) 16 S.W.(2d) 900; Fox v. Ry. Co. (Tex. Civ. App.) 186 S. W. 852.

"When in the Cashin Case we consider as a whole the instructions and issues constituting the charge, considering them in the order as prescribed by their wording, we find the following:

"The court asks the jury in issue No. 1 whether defendant, West, agreed to pay Cashin what would be a fair commission under all the circumstances for his 'services in assisting in said sale.' The type of services in question was thereby fixed. The services were to be 'services in assisting,' and the jury found that West did agree to pay Cashin a fair commission for his 'services in assisting.' Appellants find no fault with this issue.

"The court next asks the jury to find whether West invoked the 'services of the plaintiff, D. M. Cashin, to assist in making the sale.' Appellants find no fault with this issue.

"These two questions, or issues 1 and 2, deal with and define the subject-matter and interrogate the jury concerning services of the plaintiff of a certain kind, namely, 'services in assisting in' said sale' or 'services to assist in making the sale,'

and it then becomes apropos to ask the jury whether plaintiff had rendered such services—(what services? services in assisting in the sale), and such is exactly what the court proceeded to do in issue 3, wherein the jury was asked whether the plaintiff rendered 'services in assisting in making the sale.' The jury was instructed to answer issue 3 only in the event they had first answered issue 2 in the affirmative, and having first answered issue 2 in the affirmative, there could be no possible uncertainty in the minds of the jury as to 'services in assisting in making the sale' being anything more than descriptive of the services inquired about, anything more than the type or nature of services—the services in assisting or the services to assist—already inquired about in issues 1 and 2."

■ The court gave the following special instruction to the jury: "You are charged, as a part of the law in this case, that any fact before you may be established by circumstantial evidence or direct evidence or both. In this connection you are also charged that a fact is established by direct evidence when proved by witnesses who saw the acts done or heard the words spoken. A fact is established by circumstantial evidence when the existence of it is fairly and reasonably inferred from other facts proved in the case."

By appellants' eleventh proposition it is contended that as this case was submitted on special issues the court erred in instructing the jury that any fact before them might be established by circumstantial evidence or direct evidence, or both, and in connection with such instructions to define circumstantial evidence and direct evidence, as such instructions and definitions are prohibited by article 2189 of our Revised Civil Statutes of 1925.

And by their twelfth proposition, grouped with proposition 11, they contend that in this cause the parties depended wholly upon direct testimony and that in such case the court erred in instructing the jury that "any fact before you may be established by circumstantial evidence or direct evidence, or both."

We overrule such contentions. We think the direct evidence adduced discloses several and various circumstances which the jury had the right to consider in reaching a conclusion as to whether appellee Cashin, at the request of J. M. West, rendered services to assist West in the making of the sale in question.

■ Where a litigant relies wholly or partly upon circumstantial evidence to support his contention, it is his right to have the court instruct the jury that they may consider that character of evidence in determining the issue. Jones v. Hess (Tex. Civ. App.) 48 S. W. 46; Rounds v. Coleman (Tex. Civ. App.) 214 S. W. 496; Venting v. Carrigan (Tex. Civ. App.) 26 S.W.(2d) 711, writ of error dismissed; Schaff v. Copass (Tex. Civ. App.) 262 S. W. 234, writ of error dismissed.

We find nothing in the article of the statute mentioned in appellants' eleventh proposition which prohibits the court from giving to the jury, in a proper case, a definition of the legal term "circumstantial evidence." The article referred to provides as follows: "In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues."

■ While appellee, Cashin, was on the stand as a witness he testified that J. M. West, after the sale was made to the Humble Oil & Refining Company, asked him to come to his office; that upon such request he went to West's office, and that West told him that he (Cashin) had been of very material assistance in closing the trade with the Humble Oil & Refining Company and said that he (Cashin) did not make any money on the amount defendants had given him, and that it was intended he should be compensated in the event a sale was made, and asked him what he owed him in the way of a commission; that he then said to West that he had spoken to him several times about arranging a commission and that West said he would set it when the trade was consummated; and that as the trade was consummated he thought it was up to West to set it. West then said he (Cashin) should set it, and that he told West to set it.

At this point the witness was asked: Q. "What was the next thing that was said?" In answer to such question the witness said: "Mr. West said, 'How about $2500.00?'"

Counsel for defendants objected to the question and answer thereto, and moved to strike out said answer as involving an ef-

fort to compromise and because any such testimony to the effect that defendant West had stated, "How about $2500.00?" was made (if at all) in an effort to settle and compromise a disputed claim and to buy peace, and the admission of any such testimony was calculated to lead the jury to believe that defendant West admitted all of the disputed facts except the amount to be paid plaintiff, which objection and motion the court overruled.

It is clear that appellants grounded their objection to the testimony of Cashin that West said: "How about $2500.00?" upon their contention that the statement was an offer of compromise of the controversy between the parties, and now in this court, by their proposition 14, they insist that the trial court erred in allowing Cashin to testify that West stated, "How about $2500.-00?" in that such offer not having been accepted by Cashin, and the circumstances surrounding the making of the statement showing that it was made in an attempt to compromise a disputed claim and prospective lawsuit.

It is evident that the statement was introduced, not to show an effort to compromise a then existing dispute between the parties of a prospective suit, but solely for the purpose of showing an admission on the part of West of the agreement alleged by Cashin, and that Cashin had given assistance to West in consummating the sale to the Humble Oil & Refining Company. Prior to the time West made the inquiry mentioned there did not exist any dispute between the parties as to the amount to be paid to Cashin. It was merely a feeler on the part of West as to what Cashin would claim.

It is clearly the law that such an inquiry made before any disagreement or dispute took place is admissible. Lloyds America v. Poe (Tex. Civ. App.) 69 S.W. (2d) 160; Texas & Pacific Ry. Co. v. Spann (Tex. Civ. App.) 173 S. W. 600; Sanford v. John Finnigan Co. (Tex. Civ. App.) 169 S. W. 624; Pope v. Ansley Realty Co. (Tex. Civ. App.) 135 S. W. 1103; 22 Corpus Juris, p. 212, and citation of authorities there found; McKnight v. Milford Gin Co. (Tex. Civ. App.) 99 S. W. 198; Upson v. Campbell (Tex. Civ. App.) 99 S. W. 1129.

Not only had no controversy or disagreement arisen between West and Cashin when West asked, "How about $2500.00?" but, as in the Upson and McKnight Cases, supra, the question is on its face, pure and simple, a mere inquiry as to what Cashin had in mind, and if West had any thought that a controversy might be imminent, he had as yet given no inkling of it.

■ We think the testimony complained of was admissible. If, however, there was error in the testimony in the first place that error was waived or cured by the subsequent introduction of the testimony of West to the effect that he had made the inquiry, "How about $2500.00?" Shaw v. Brennan (Tex. Civ. App.) 22 S. W.(2d) 1092.

■ By appellants' proposition 15 it is contended that the court erred in rendering judgment for the plaintiff for the full sum of $25,000 against appellants, for the reason that the jury found that plaintiff was entitled to a compensation of $25,000 only; wherefore, the court should have deducted the sum of $1,300.59 from the sum awarded by the finding of the jury, that being the sum paid to appellee for the geological report prepared by him for West.

We sustain this contention. Both the pleadings of the plaintiff and the evidence show that it had been agreed between the parties that the deduction claimed should be made.

Having reached the conclusions expressed, the judgment is reformed by deducting therefrom the sum of $1,300.59, and as so reformed it is affirmed.

Reformed and affirmed.