**BAKER v. LOFTIN et al. (No. 157–3130.)**

(Commission of Appeals of Texas, Section A. June 2, 1920.)

1. **Negligence** ⊚⇒136(2)—**Ordinarily question of fact.**

Ordinarily, negligence is a fact to be found by the jury from the testimony, yet some acts are so obviously dangerous and reckless that no court should hesitate to declare them negligent.

2. **Railroads** ⊚⇒382(6)—**Intoxicated person asleep on track negligent.**

A railroad's section foreman, knowing the schedules of trains, by drinking to the point of stupor and falling asleep on the track in the evening, when he was passing along on his own affairs in the railroad's hand car, at a time when a train was about due to pass, was guilty of negligence contributing to his death when struck.

3. **Railroads** ⊚⇒390—**Knowledge of peril essential under last chance doctrine.**

To recover against a railroad for death of an intoxicated person on the track, on the theory of breach of duty imposed by discovery of his peril, it is essential to show, not merely that those in charge of engine by exercise of reasonable care might have acquired a knowledge of his peril in time to avoid injury, but that they actually possessed it.

4. **Evidence** ⊚⇒587—**Circumstantial evidence must have probative force constituting basis of inference.**

While any fact may be established by circumstantial evidence, such evidence must have probative force sufficient to constitute the basis of a legal inference, and not be such as to permit of merely speculative conclusions.

5. **Railroads** ⊚⇒398(4)—**Evidence insufficient to show discovered peril.**

In an action against a railroad for a death on its track, evidence *held* insufficient to support finding of fact necessary to road's liability on theory of discovered peril, that is, fireman and engineer saw decedent and knew of his peril in time to avoid injuring him, and yet failed to use all means within their power.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by Smithie Loftin and others against James A. Baker, receiver for the International & Great Northern Railway Company. From judgment for plaintiffs, defendant appealed to the Court of Civil Appeals, which affirmed (198 S. W. 159), and defendant brings error. Judgments of the trial court and Court of Civil Appeals reversed, and judgment rendered for defendant on recommendation of the Commission of Appeals.

Doremus, Butler & Henderson, of Bryan (Wilson, Dabney & King, of Houston, of counsel), for plaintiff in error.

Lamar Bethea and W. C. Davis, both of Bryan, and Ward & Bickett, of San Antonio, for defendants in error.

TAYLOR, J. This was a suit by the widow and children of Charles Loftin, defendant in error, against the International & Great Northern Railway Company, plaintiff in error, to recover damages arising out of Loftin's death, caused by his being knocked from the railroad track by plaintiff in error's passenger train.

The opinion of the Court of Civil Appeals states that the testimony developed the following facts:

"Charlie Loftin was a section foreman in the employ of appellant, and lived in appellant's section house at Fountain switch, which is about 7 miles in a northern direction from Bryan, Tex., and about 1 mile north of the bridge near which deceased was killed at the time alleged, by appellant's engine. Appellant furnished deceased with a motorcar to be used and operated by deceased on appellant's railroad track, subject to several rules known to deceased. Deceased employed laborers in the work required of him as section foreman. On Saturday, July 1, 1916, deceased, with his nephew and two Mexican laborers, were busy performing their duties for appellant on the section until 5 o'clock p. m., after which time all four went on the motorcar from the section house at Fountain switch for the purpose, among other things, of getting money for the Mexican laborers. After arrival in Bryan, the Mexicans bought provisions, and about 9:30 p. m. all the party, boss, nephew, and laborers, mounted the motorcar to return from Bryan to the section house at Fountain switch. While in Bryan deceased and his nephew drank four or five glasses of beer each. When the party left Bryan, deceased had several bottles of beer and a 50 cent bottle of whisky with him. Deceased operated the motorcar. After traveling about 5 miles from Bryan, the car stopped at Thompson Creek crossing, which was about 2 miles from the section house at Fountain switch, and about 1 mile south of the scene of the killing. Here the entire party dismounted from the motorcar and remained nearly 2½ hours. The Mexicans mounted the motor first (on returning to the car), deceased became angry with them, and required them to get off. Then deceased attempted to force them to get back on, but the Mexicans ran off along the railroad track in the direction of the section house. Deceased took his position on the motorcar and told his nephew to shove the car off, which he did. Deceased was angry with the nephew, and forced him to get off the motor while in motion. There was a lighted lantern on the frame of the motorcar visible from the rear of the motorcar. The motor was heard popping by the nephew as it went for quite a distance. The nephew made his way to the section house across the fields, where he secured a lantern for the purpose of returning to meet his uncle, but did not do so. The motor stopped near a bridge about 1,200 feet north from the Smetana Railroad crossing, a public crossing. The lighted lantern on the motor was seen burning at 12 o'clock midnight, at this point by a party of boys and girls, who also heard a man singing in the neighborhood of the lantern. The light was visible from the Smetana crossing, and was seen by the group of boys and girls

from distances of 200 to 500 yards, and seemed to be on the railroad track, near the railroad bridge."

The accident occurred on a two-degree curve of the track between Fountain and Smetana, between 1 and 2 o'clock a. m. There is evidence that between the stations named there was a well-beaten path in the middle of the track, which was used habitually both in the daytime and night by the people living in that vicinity. The curve was between a half mile and a mile in length, and the night of the occurrence was dark. There were no eyewitnesses, except the locomotive engineer and fireman, and only the latter testified to actually seeing deceased on the track at the time of the accident.

J. R. Garner, the engineer, testified that he was sitting in the engineer's seat box on the right-hand side of the cab, the side on the inside of the curve, running the train about 50 miles per hour; that the first he knew of the presence of any one on the track was when the fireman called out, "We are going to kill a man;" that he instantly applied the air and stopped the train, which was about 475 feet in length; that after he struck the man he ran the length of the train, and about 180 or 200 feet further; that 600 feet was a good stop for a train of that length; that after Loftin was seen it was impossible to stop the train with all the means at command in time to avert the injury; that the hand car, which he saw about the time the fireman saw deceased, was about 40 or 50 feet further north from where the man lay; that when he first saw it, and when the engine struck it, it was derailed, as much as half of it being off of the track; that when the fireman called out that a man was about to be killed, the engine could not have been over 60 or 70 feet from him.

P. E. Driver, the fireman, testified that he was on the left or west side of the engine, and could not see the inside of the curve; that he was leaning as far out of the cab as he could, looking ahead; that about the middle of the curve he saw a man lying on the side of the track 30 or 40 feet from the pilot of the engine, with his head on the rail and his shoulders between the ties, facing north, his feet extending out from the track; that he called to the engineer as soon as he saw him that they were going to kill a man, and that the engineer applied the air and stopped the train; that the man could not have been seen sooner than he saw him.

The crew on returning to the scene of the accident found Loftin lying on the south side of the track, parallel with it, "just off of the end of the ties," breathing but unconsious, his head pointing west. The skull seemed crushed from a wound in the back of the head, the only wound on the body. Loftin was taken to the hospital at Pales-

tine, where he died without regaining consciousness.

The fireman and engineer testified along the same line as to their inability to see deceased on the track sooner than he was discovered, and the reasons therefor. The engineer testified in part as follows:

"The reason I did not discover this man was that the curve at that particular place curves to the right, and the headlight goes straight forward past the place, and does not follow the track. There is a possibility that if I had known the man was there that I could have put my head out of the window and seen him maybe 40 or 60 feet, standing still or moving at a very low rate of speed, but the conditions that confronts an engineer going at that rate of speed cuts off the view for that distance. It would have been impossible for me to have seen him within the 60 feet, it makes no difference what I had done. The headlight of an engine throws out the light straight up the track. The rays of the light are parallel with the engine. On the engines of high rate of speed we focus the headlight out as far as possible in order to protect against persons and cattle or anything on the track as much as possible. In this instance I think we had it focused out about 700 feet. That is where it centered best on the track. * * * In going around a curve the direct rays of the headlight go out straight across the fields. As the engine comes around the rays of headlight come around too, until you get on a straight track."

Witnesses who visited the place of the accident the following morning testified that groceries of various kinds were scattered along the south side of the track, and that blood was discovered on that side of the track; that the lantern and motorcar were found on the same side of the track some distance apart; that the track was level for a long distance in the vicinity of the accident; that from Smetana crossing to the scene of the accident the elevation of the track was from 2 to 4 feet above the level of the land; that there were no objects to obstruct the view from Smetana crossing to the point on the curve at which deceased was struck, and for a considerable distance beyond.

Several of defendants in error's witnesses, after the death of deceased, made experiments in the vicinity of the scene of the accident. The observations were made by the light of passing trains while the witnesses were on and near the track. Some of the testimony was to the effect that one standing about 9 feet from the track when the train passed could plainly see a person standing on the track about 200 steps away on the curve; that one standing at the place of accident took out his watch when the train reached Smetana crossing about a fourth of a mile away, and was able to tell by the light from the engine that it was 1:25 o'clock. None of the observations were made from the cab of a locomotive, and the

witnesses, when making them, did not know the position of the deceased when injured.

Plaintiff in error's witnesses made similar experiments, taking a locomotive engine for the purpose. The substance of their testimony was that one lying on the track where deceased was struck could not be seen further than 250 feet. One of the witnesses occupying the engineer's seat stated he was within 81 steps from the object on the track before he could tell that an object was there, and that he was within 31 steps of it before he could discern that it was a man.

Defendants in error's petition contains two counts. In the first it is alleged, among other things, that the track where Loftin was struck was commonly and habitually used by the public as a highway; that he, while on the track, was from some cause unable to leave the same, and unable to realize the danger of his position; that because plaintiff in error's servants failed to keep a proper lookout deceased was run over and killed. The second count of the petition predicates liability upon discovered peril. Both theories of the case were submitted to the jury. Plaintiff in error requested a peremptory instruction in its favor, which was refused.

The court charged the jury, among other things, that Loftin was in violation of · the rules of defendant company when he took the motorcar and used the same on the track of plaintiff in error in the day and night time of July 1, 1916. The jury returned a verdict, upon which judgment was rendered, in favor of defendants in error. The Court of Civil Appeals affirmed the judgment. 198 S. W. 159.

The following notation was made by the Committee of Judges in granting the writ:

"We fail to see in the evidence any negligence of the railroad company, and in our opinion the uncontradicted evidence discloses contributory negligence of the deceased."

We find it necessary to discuss only two questions:

(1) Was Loftin guilty of contributory negligence proximately resulting in his death?

(2) Was there any evidence that the railway company discovered his perilous position on the track in time to avoid injuring him?

Conceding, but not deciding, that plaintiff in error was negligent, the question first stated logically follows.

[1] Ordinarily—in fact in practically all negligence cases—negligence is a fact to be found or inferred from the testimony, "yet some acts are so obviously dangerous and reckless that no court should hesitate to declare them negligent. G., H. & S. A. Ry. Co. v. Ryon, 80 Tex. 59, 15 S. W. 588; Sanches v. S. A. & A. P. Ry. Co., 88 Tex. 117, 30 S. W. 431. This case presents acts on the part of Loftin of that character.

Dewey Been was Loftin's nephew and the leading witness for defendants in error. According to his testimony his uncle was drunk when he and his party left Bryan for home, carrying intoxicants on the hand car with them. At a point about 2 miles from Fountain they dismounted from the car, where they remained in the vicinity of the railroad track for about 2½ hours, having a kind of "singing and a jambaree." Loftin then proceeded to run his companions off, first the Mexicans, chasing them down the track; then his nephew, who "took across the field" when Loftin drew his knife. It was then about midnight. The nephew decided after a time to return to his uncle, fearing for his safety. It is not controverted that Loftin was drunk when last seen, and no other reasonable deduction than that he was can be drawn from the testimony. The evidence bearing upon the subsequent happenings is consistent with the conclusion that he was in a drunken stupor, or asleep, when struck by the train.

The court charged the jury that his using the motorcar upon the track at the time he did was in violation of the company's rules. His presence on the track at the time he was injured can be accounted for upon no other theory than that he remained there because intoxicated and in reckless disregard for his own safety.

[2] There is no evidence that it was necessary for him to be there. The allegation is "that he, while on the track, was for some cause unable to leave the same, and unable to realize the danger of his position." There is no cause revealed by the testimony for his not leaving it, other than that stated. He was a section foreman, knew the schedules of the passing trains, and must have realized that he was in a dangerous position, unless his mental faculties, on account of drink, played him false. Under the facts stated Loftin was guilty of negligence contributing to his injury and subsequent death. Railway Co. v. Shiflet, 98 Tex. 102, 83 S. W. 677; Id., 94 Tex. 131, 58 S. W. 945; Id., 98 Tex. 102, 81 S. W. 524; Railway Co. v. Sympkins, 54 Tex. 618, 38 Am. Rep. 632; Smith v. Fordyce et al., 18 S. W. 663; Railway Co. v. McDonald, 99 Tex. 213, 88 S. W. 201.

[3, 4] 2. Was there any evidence that the railway company discovered Loftin's perilous position on the track in time to avoid injuring him? It is well settled that the burden of proof was upon the defendants in error, in order to recover for a breach of duty imposed by the discovery of Loftin's peril, to show, not merely that those in charge of the engine by the exercise of reasonable care might have acquired a knowledge of his peril in time to avoid injuring him, but that they actually possessed it. T. & P. Ry. Co. v. Breadow, 90 Tex. 26, 36 S. W.

410; Railway Co. v. Staggs, 90 Tex. 458, 39 S. W. 295. The question, concretely stated, is, Did the fireman or engineer, or either of them, knowing of Loftin's perilous position, fail to use all means then available consistent with the safety of the train to avoid injuring him? There is no direct testimony that the engineer saw Loftin upon the track at any time, or that the fireman saw him in time to prevent the accident. It is not controverted that the night was dark or that Loftin was injured while upon a curve of the track. The only testimony as to his position when struck was that only his head was on the track. His shoulders were between ties, his feet extending out from the rail. His face was turned north (away from the engine). There are no circumstances connected with the actual occurrence of the injury raising the issue that those operating the engine actually saw Loftin in time to stop the train before it reached him. While, generally speaking, any fact may be established by circumstantial evidence, yet such evidence must have probative force sufficient to constitute the basis of a legal inference. It should not be of such character as to permit of purely speculative conclusions. Mo. Pac. Ry. Co. v. Porter, 73 Tex. 304, 11 S. W. 324.

It is urged that the circumstantial evidence growing out of the experiments made by defendants in error's witnesses is sufficient to raise the issue whether those on the engine actually saw Loftin at the time alleged. In some instances experimental evidence is of a very convincing character, but it should always be based upon facts established in connection with the occurrence involved, sufficient to show that the experiments had a substantial basis in facts, and that they were made under conditions substantially similar to those surrounding the occurrence. Defendants in error's witnesses in making the experiments were in ignorance of whether Loftin was lying upon the track or was on the hand car, or whether he was standing upon the track. Those making the observations, instead of being in the position of the engineer and fireman in a moving locomotive, were on the ground and stationary. Those taking the position supposed to be occupied by deceased were in a standing position only.

[5] .Whether the evidence based upon observations made under the conditions stated could have been properly admitted as tending to reveal circumstances, which, together with others, might have tended to establish a want of care upon the part of those in charge of the engine, we need not determine; but, in our opinion, the evidence does not, standing alone, possess that degree of probative force necessary to form the basis of the fact vital to the company's liability on the theory of discovered peril, to wit, that the fireman and engineer saw Loftin, and knew of his peril, in time to avoid injuring him, and, having such knowledge, failed to use all the means then within their power to avoid doing so.

We think it sufficient to point out without any discussion of the holdings in Ft. W. & D. C. Ry. Co. v. Broomhead, 140 S. W. 820, and S. A. & A. P. Ry. Co. v. Jaramilla, 180 S. W. 1126 (writs of error denied), relied upon by defendants in error, that both cases are distinguishable from this case in the particular, among others, that the circumstantial evidence in both, bearing upon discovered peril, grew out of circumstances surrounding the actual occurrences upon which the cases arose.

The peremptory instruction requested by plaintiff in error should, in our opinion, have been given.

We recommend that the judgments of the trial court and Court of Civil Appeals be reversed, and that judgment be rendered for plaintiff in error.

PHILLIPS, C. J. We approve the judgment recommended in this case.