### COBB et al. v. TEXAS & N. O. R. CO.

No. 12223.

Court of Civil Appeal of Texas. Dallas.

May 22, 1937.

Rehearing Denied June 26, 1937.

Truett, Abernathy & Wolford, of Mc-Kinney, for appellants.

Head, Dillard, Maxey-Freeman & Mc-Reynolds, of Sherman, for appellee.

JONES, Chief Justice.

This suit was instituted in the district court of Collin county by appellants—Minnie Bell Cobb, for herself and as next friend of Eva Joe Cobb, her minor child, and by Elizabeth Cobb, mother and surviving parent of Archie Cobb, deceased—against appellee, Texas & New Orleans Railroad Company, to recover damages for the alleged wrongful death of Archie Cobb, deceased husband of Minnie Bell Cobb, deceased father of Eva Joe Cobb, and deceased son of Elizabeth Cobb. The trial was to a jury and resulted in favor of appellee on an instructed verdict by the court. An appeal has been duly perfected to this court and all questions herein discussed were properly raised by appellants. The following are the necessary facts:

Deceased resided with his family in the city of McKinney, and his business was that of a textile worker in the cotton mills in said city. The undisputed evidence shows that deceased was run over and killed within the city limits of the city of McKinney on the early morning of July 2, 1935, at approximately 4:15 o'clock. The railroad runs through the city of McKinney at approximately a north and south direction. The train that caused deceased's death was a northbound train, owned and operated by

appellee, and consisted of an engine, tender, and 14 freight cars. Appellee's track crosses Wilson creek and the north end of the bridge across the creek is 7,057 feet south of the place on the track where deceased was killed. It is upgrade from Wilson creek to the place of collision. The elevation at the point of collision is 62.8 feet higher than at the north end of the Wilson creek bridge. Elm street marks the south boundary line of the city of McKinney and the center of Elm street is 557 feet south of the place of collision. The track from the center of Elm street to the place of collision is only slightly upgrade, the place of collision being 1.6 feet higher than the center of said street. The speed of the train is given only at one place, approximately 500 feet south of the place of the collision, and this witness stated that such speed was 15 miles per hour. A city ordinance, introduced in evidence, prohibits the running of trains, within the corporate limits of the city, in excess of 6 miles per hour.

Appellants took the depositions of J. T. Fleetwood, head brakeman, and T. H. Callahan, fireman on the train, that caused the death of deceased, and introduced a part of each deposition in evidence. It was thus proven by the head brakeman that at the time of the collision he was in the gangway on the right side of the engine, and saw deceased in a sitting position between the rails in the middle of the track, and that the man made no move from time he first saw him until he lost sight of him around the front end of the engine; that the train consisted of 14 cars of the average length of about 40 feet, and the train was about 600 feet long; that when the engineer is on his seat box, his eyes are about 10½ or 11 feet above the railroad tracks; that after the witness saw the man on the track he did nothing until the train stopped; that the train was No. 257 and the engine No. 846, and that the witness had been a brakeman since 1924.

Appellee introduced in evidence the answer of the eighth direct interrogatory, not offered by appellant, and proved that, "From the time I recognized it to be a man on the track it (the train) was about a hundred and fifty feet from him to the best of my judgment. I did nothing to keep the train from running over the man, because when I recognized it to be a man on the track, before I could make any outcry, the engineer applied the brakes. Also the fireman shouted to the engineer at the same time the engineer applied the brakes."

Appellants proved by the deposition of the fireman that he had been a locomotive fireman for appellee since February, 1920; that one of his duties was to keep a close lookout on the track ahead, and watch for obstructions, or misplaced switches and indications of signals; that the train collided with and ran over the man; that he saw the body about two minutes after the collision, lying between the rails of the track underneath a car on the head-end of the train; that the man appeared to be dead (he described the injuries he observed on the man); that he saw the man before he was struck by the train, and that, "He was sitting down between the rails, facing east, legs stretched out front of body, and the entire body leaning forward into his lap"; the witness further stated that he was sitting on the fireman's seat box on the left-hand side of the engine; that he continued to look at the man until he passed from view in front of the engine; that the man was sitting in the position described above, and did not make any move whatever.

Appellee offered the answer to the eighth direct interrogatory which had not been offered by appellant, and proved that "The man was about one hundred and fifty feet in front of the engine. I immediately hollered to the engineer, who had, at about the same time seen the man and applied brakes in emergency. The engineer applied air brakes in emergency, open sanders sounded stock alarm whistle signal." Appellee also offered in evidence the answer to the first cross-interrogatory and proved that "Immediately after I saw the man on the track I hollered to the engineer, who had, at about the same time, seen the man and applied the air brakes in emergency. I continued to watch the man until he passed from my view in front of engine."

Appellants proved by a witness, who came to the scene of the collision soon thereafter, that he saw the headlight on the train, and observed the distance which it would light up the track, and that such distance was from 1,000 to 1,500 feet. The track from the place of collision south was straight for 1,292 feet. South of this point there were two curves between it and the bridge across Wilson creek.

Appellants alleged various grounds of negligence, also alleged "discovered peril" as a ground for recovery. It is not necessary to discuss either the allegations or the

evidence in respect to any of these grounds of negligence, except that in respect to "discovered peril," for the reason that, as against the other allegations of negligence, the undisputed evidence shows that deceased was guilty of contributory negligence, as a matter of law, which bars recovery on any of said other grounds of negligence. In fact, appellants do not contend on this appeal that they have a right of recovery on any other ground save that of "discovered peril," but they earnestly insist that the evidence raises a jury issue as to this ground of recovery, and that the court erred in not submitting such issue to the jury.

While appellee specifically denied that deceased's death had been occasioned by the train in question, and pleaded, among other things, that deceased had been killed and placed on the track, yet the evidence tends strongly to show that deceased was alive at the time he was struck by the engine pulling the northbound train. The undertaker, experienced in his profession, reached the scene not over thirty minutes after the fatal occurrence and testified that the body was warm and relaxed when he first saw it. The amount of blood at the place it was found also indicated that deceased was alive when the collision occurred. That deceased was alive when struck by the train, is the only reasonable conclusion to be drawn from the evidence, and the court, in determining appellee's right to peremptory instruction, had to consider this reasonable conclusion as a proven fact.

Appellee also pleaded that deceased had gone upon the track in an intoxicated condition, but there was no evidence that deceased was in such condition when he sat down upon the track. However, the fact that deceased was not aroused by the noise of the freight train or by the sound of the engine whistle or bell, and never moved from the time he was first seen by the fireman and head brakeman until he was struck by the engine, together with the fact that, immediately after the collision, his body was still warm and relaxed, would clearly indicate that deceased, for some unknown reason, had sat down upon the track and fallen asleep, from which condition he was never aroused, and this is the only reasonable conclusion to be drawn from the known facts. In giving the peremptory instruction, the court also had to assume that this fact existed. This court finds that the only reasonable conclusion to be deduced from the evidence is that deceased had voluntarily gone upon the track, sat down, and fallen asleep.

Any acts of negligence that may have been committed by appellee's train operatives, prior to the discovery of deceased on the track and the realization of the fact that he was in a dangerous and perilous condition, from which he would not or could not escape by his own act, are rendered nugatory, for the reason that, as a matter of law, deceased was guilty of contributory negligence, barring recovery because of such antecedent acts of negligence. Appellants therefore are relegated entirely to their pleading of "discovered peril." San Antonio Traction Co. v. Kelleher, 48 Tex.Civ.App. 421, 107 S.W. 64; Dallas Ry. & Term. Co. v. Bankston (Tex. Com.App.) 51 S.W.(2d) 304, 308; Northern Texas Traction Co. v. Weed (Tex. Com.App.) 300 S.W. 41; Northern Texas Traction Co. v. Singer (Tex.Civ.App.) 34 S.W.(2d) 920, 923.

It is elementary that a plaintiff, in making his case, must present evidence that when considered in the light most favorable to him, presents a prima facie right of recovery, and if he makes such a case by his evidence, he has the right to go to the jury, notwithstanding evidence to the contrary offered by defendant; on the other hand, if he fails to make a prima facie case by his evidence, defendant is not required to offer any evidence, but can stand on plaintiff's failure in this respect and demand peremptory instruction in his favor. The question for decision therefore is: Did appellants, by their evidence, make a prima facie case for recovery under the doctrine of "discovered peril"; that is, did the evidence prima facie show that the train operatives, on the occasion in question, failed to use all of the means at their command, consistent with their own safety and the safety of the train, to prevent the catastrophe of colliding with deceased, after he was discovered on the track and his perilous position realized? If such case was thus made, then the peremptory instruction against appellants was error; if the evidence failed to make a prima facie case in this respect, then there was no error in giving the peremptory instruction.

Appellant's right to recover in the instant case, under the doctrine of discovered peril, notwithstanding the fact that the deceased was guilty of contributory negligence, as a matter of law, has for its basis the fact that, at the moment appellee's train

674

operatives, or any of them, discovered deceased on the track and realized his perilous position, there immediately rested on them the new duty to use all of the means at their command to stop the train before it struck deceased, for the inquiry is not, when such train operatives, in the exercise of ordinary care, should have discovered deceased on the track, but when did they or any of them actually discover deceased on the track and realize his perilous position (see authorities cited next above).

The evidence shows that the headlight of the engine lighted the tracks for a distance of from 1,000 to 1,500 feet in front of the engine, but this evidence is not even a potent factor in determining the crucial issue of when deceased was actually discovered. 20 R.C.L. page 142, § 116, thus succinctly states the law in this respect: "The defendant's knowledge, however, must have been actual knowledge; he is not to be held liable upon proof that he ought to have discovered the plaintiff's perilous situation, for such proof does not establish superior knowledge of the peril. It is what the defendant did or failed to do after acquiring knowledge of the plaintiff's peril that constitutes the breach of duty. * * *" Again, in the same volume page 143 a part of section 117 reads: "Not only must the defendant have had actual knowledge of the plaintiff's dangerous situation, but he must have been aware also of the plaintiff's unconsciousness of or inability to avert the peril. The plaintiff's right of recovery exists when the defendant, after having discovered his peril, having also reasonable grounds to believe him unconscious of danger, or unable to avoid it, might himself, by the exercise of ordinary diligence, have prevented the mischief that followed." These quotations from R.C.L., supra, are supported by numerous authorities, including Hays v. Gainesville Street Ry., 70 Tex. 602, 8 S.W. 491, 8 Am.St.Rep. 624.

30 Texas Jurisprudence, page 681, § 32, declares that the elements or factors that enter into the issue of discovered peril are: "(1) The exposed condition brought about by the negligence of plaintiff; (2) the actual discovery by defendant's agents of his perilous situation in time to have averted—by the use of all the means at their command, commensurate with their own safety—injury to him; and (3) the failure thereafter to use such means." Northern Texas Trac. Co. v. Singer (Tex.Civ.App.) 34 S. W.(2d) 920, 923; Baker v. Shafter, (Tex. Com.App.) 231 S.W. 349; Northern Texas Trac. Co. v. Weed (Tex.Com.App.) 300 S. W. 41, 44.

The controlling issue in the instant case is whether the perilous position of deceased was discovered in time for appellee's train operatives to have avoided striking deceased, by instantly making use of all the means at hand? The burden rested upon the appellants to make a prima facie case that the death of deceased could have been avoided by the use of all the means at hand commensurate with their own safety.

The evidence shows that the train ran north on a slight upgrade for 1,292 feet before striking deceased; that the headlight of the engine lighted the track for a distance of from 1,000 to 1,500 feet; that at some place striking the deceased, the appellee's head brakeman, riding in the engine, and its fireman, sitting in the fireman's seat, saw deceased and realized his danger; and that the engineer, as shown by his acts and conduct, must have been deceased at the same time, and also realized his danger. The only reasonable conclusion to be drawn from the evidence of these two employees is, that the only means of preventing the train from sriking deceased after he was discovered, was for the train to be brought to an immediate stop before such occurrence could happen. The recognized means for stopping the train in an emergency is to apply at once the emergency brakes and open the sand valves on the engine, this the undisputed evidence shows was instantly done by the engineer, but it was unavailing to prevent the injury. The only reasonable conclusion to be drawn is that the discovery was not made in time to avoid the fatal result.

We have given a fair summary of the evidence offered by appellants to make a prima facie case of their right to recover on the doctrine of "discovered peril." When did the crucial instant in appellants' case arise—that is, when did any of the train operatives discover the perilous situation of deceased and realize his danger? The evidence offered by appellants leaves this question open to mere surmise. What was done by the train employees to avoid the striking of deceased when his perilous situation was discovered? Each of these crucial questions, in so far as the evidence offered by appellant shows, is left to surmise. However, appellee, from the same depositions of the head brakeman and the fireman, shows when the discovery of deceased's perilous position was made, and that such time was

when the engine was about 150 feet south of deceased, and, further, that immediately upon such discovery, the engineer used all of the recognized means to make an emergency stop of the train, but that such means failed to stop the train until after deceased had been struck by the engine and killed. This evidence offered by appellee is undisputed, supplies the failure in appellants' evidence on these crucial points, and destroys any surmise to the contrary of which appellants' evidence might be susceptible.

In our opinion, appellants failed to make a prima facie case for the recovery of damages, because of the death of deceased, and the court did not err in giving the peremptory instruction. In each of the cases relied upon by appellants for reversal of this case, there was substantial evidence indicating that the engineer's version as to when he saw the deceased in a perilous situation was not true, or that the engineer did not at once make use of all the means at his hands to avoid striking deceased. A fair example of such cases is that of San Antonio, etc., Co. v. McGill (Tex.Civ.App.) 202 S.W. 338, and Texas & N. O. Ry. Co. v. Hart (Tex.Civ.App.) 294 S.W. 978. In each of these cases there was substantial evidence showing that the perilous situation of the injured party was seen by the engineer prior to the time he tried to make the emergency stop. This evidence is pointed out in each of these cases. While the reported cases rest on substantial evidence that would render a peremptory instruction error, in the instant case, the evidence adduced rests only on surmise, as to when such perilous condition was seen, from the fact that the track was for a long distance straight and lighted up from the headlight of the engine from 1,000 to 1,500 feet.

■ Appellants contend that the proffered evidence of R. S. Bloss, if admitted, would have raised an issue of fact, as to whether appellee's train operatives immediately used all of the means at their command, consistent with their own safety, to avoid striking the deceased, when his perilous position was discovered. Bloss was offered as an expert witness, to prove the distance within which a railroad train could be brought to a emergency stop, when moving at different designated speeds, and, if permitted to testify would have stated that a railroad train operating at 15 miles per hour, under weather conditions similar to those existing at the time of this accident, could have been stopped within approximately 100 feet. This testimony, taken in

connection with the testimony of the head brakeman and the locomotive fireman, that deceased's perilous position was discovered when the train was about 150 feet from where deceased was sitting on the track, and where he was subsequently struck by the engine, raised a jury issue for if the train could have been stopped in an emergency within 100 feet and ran over 200 feet after the actual discovery of deceased, then the conclusion would be warranted that the engineer did not immediately put in use all the means at hand to avoid striking deceased. The evidence warrants the conclusion that at the time of the discovery the train was moving at the rate of 15 miles per hour. The court sustained appellee's objection to the proffered evidence, on the grounds (1) that the witness has not shown himself competent with reference to the distance in which this train could be stopped, (2) because the hypothetical question put does not apply to this freight train on this particular occasion, and there is no sufficient basis thus far introduced to permit an expert opinion as to the distance in which this train could be stopped. To this was added the objection that the question was too general. The qualification of the witness, as given by himself, is that, "he had worked as a motorman for the Texas Electric Railway Company something like 24 years, and that he had been a motorman on other electric railways in the State of Ohio; that he had operated both freight and passenger electric trains; and that air-brakes are used both on electric and steam trains; that he had never operated a steam engine on a railroad, had never been an engineer on steam engines and had never tried to stop an engine or train." The witness further testified, in answer to appellee's question as to his qualifications, that the same type of brakes are used on electric trains as are used on railroad trains; that he had never tried to operate an engine or train, and was basing his answer that he knew within what distance a train could be stopped, upon his experience in operating motorcars as a motorman on the interrurban, and also on what he had learned from the Westinghouse air brake mechanical express, and that there is a plat shown by the Westinghouse air brake mechanical express of the time in which a steam train could be stopped.

■ It appears from the undisputed evidence that the witness had never attempted to stop a train propelled by a steam engine, but that his experience had come to him

through the operation of trains propelled by electric motors; and there is no evidence in respect to whether a train operated by electricity is similar in weight and momentum as a train operated by steam, when both character of trains are being operated at the same rate of speed. The question does not inform the witness as to the length of the train in question or the number of cars it contained, or as to whether the cars were loaded or empty. It is common knowledge that all of these elements enter into the time within which a train can be stopped. A train of loaded cars, traveling at the same rate of speed, necessarily has a greater momentum than a train of empty cars and necessarily more resistence to the emergency brakes, and hence would require a greater distance to be brought to a stop. The witness attempted to qualify as an expert, that is, he was a person, who, by reason of his superior knowledge, possessed a higher degree of knowledge in the matter of stopping trains in emergencies, than the members of the jury possessed. What aid would it be to a jury to be told that a train propelled by electricity could be stopped in an emergency after a certain distance, in determining at what distance the train on this particular occasion, propelled by a steam locomotive, could be stopped? Ordinarily, the qualication of a witness to give expert testimony rests in the discretion of the trial court, and we believe that, in the instant case, the qualifications shown by the witness are of such doubtful character that the court did not abuse is discretion in sustaining the objection.

■ Another bill of exception is reserved to the action of the trial court, in respect to the offer of appellants to prove by the witness, Bloss, the distance that the headlights of an engine will illuminate the track. In addition to the witness' qualifications in respect to the time in which a train could be stopped in an emergency, the witness gave testimony that he had operated for many years electric trains between Dallas and Sherman, and that appellee's railroad tracks, for a considerable portion of this distance, ran near to and parallel with the tracks of the interurban, and that during that time he had observed the railroad trains being operated on appellee's track, and had observed the distance that the headlights of the engine, pulling such trains, would illuminate the track. If permitted to answer, the question as to how far such track could be illuminated by the engine headlight, he would have stated "about 1,500 feet." We believe this evidence was admissible, and that the court abused its discretion in sustaining appellants' objection to the witness' qualification to testify in this respect. The track, as we have seen, from a point 1,292 feet south of the scene of the fatal collision with deceased was straight and unobstructed. However, we do not think that such error is material, for the reason that, as stated above, another witness testified to the same effect, in respect to the distance an engine headlight, illuminating the track, as Bloss would have testified, and, in giving the peremptory instruction, the court had to assume that the track would have been so illuminated. The other part of the proffered evidence of the witness, to the effect that an object seen on the track could have been recognized as a man 700 feet away, we do not believe, for the reasons stated in the other assignment of error, that the court abused its discretion in not admitting such evidence. However, if we are mistaken in this, the proffered evidence was immaterial for the issue is not how far deceased could have been seen and recognized as a man, but when was he actually seen and so recognized.

■ There was no error in refusing to admit the statute in evidence, defining the character of headlights that must be placed on a locomotive engine, as the law of the case is for the court, and, if it had been necessary for the jury to be informed as to the character of headlights defined by the statute, it was the court's duty to so inform them.

We have carefully examined all assignments of error, with the result that we do not find reversible error. We believe that the court was warranted in giving the peremptory instruction, that the case must be affirmed, and it is so ordered.

Affirmed.