**GULF, C. & S. F. RY. CO. v. SNOW et al.**

No. 3755.

Court of Civil Appeals of Texas. Beaumont.

Dec. 5, 1940.

Rehearing Denied Jan. 8, 1941.

Terry, Cavin & Mills, of Galveston, C. T. Duff, of Beaumont, and Claude Lewis Madeley and Foster & Williams, all of Conroe, for appellant.

McComb & Davis, of Conroe, and Earl Cox, of Houston, for appellees.

WALKER, Chief Justice.

On the 29th day of July, 1939, at a point on its railway track about six miles west of the city of Conroe, in Montgomery county, one of the motor passenger cars

of appellant, Gulf, Colorado & Santa Fe Railway Company, ran over and killed Aubry Snow. This suit was brought by his surviving wife, Mrs. Blannie Snow, for herself and as next friend of her five minor children, born to her and the deceased, joined by J. S. Snow and his wife, Amanda Snow, parents of the deceased, against appellant for the damages suffered by them by reason of the death of Aubry Snow. As grounds of negligence proximately causing the death of Aubry Snow, appellees plead that appellant's servants in charge of the train failed to keep "a proper lookout," found in their favor by the jury, and appellees also plead "discovered peril," found against them by the jury. On the admitted facts, the deceased at the time he was struck by appellant's train was a trespasser on its tracks.

On oral submission this case was argued on the theory, recognized by both parties as the law of the case, that the deceased, at the time he was injured, was guilty of contributory negligence, as a matter of law, unless some circumstance intervened to neutralize his negligence as a contributing cause of his death. The authorities support that proposition. Texas Midland R. R. Co. v. Byrd, 102 Tex. 263, 115 S.W. 1163, 20 L.R.A.,N.S., 429, 20 Ann.Cas. 137; Baker v. Loftin, Tex. Com.App., 222 S.W. 195; Cobb v. Texas & New Orleans Railroad Co., Tex.Civ. App., 107 S.W.2d 670; Gulf, Colorado & Santa Fe Ry. Co. v. Russell, 125 Tex. 443, 82 S.W.2d 948; Houston & T. C. Ry. Co. v. Sympkins, 54 Tex. 615, 38 Am.Rep. 632.

As neutralizing the negligence of the deceased, appellees plead the following circumstances found in their favor by the jury, answering questions 6, 7, 8, and 18: Immediately prior to and at the time of his injury, Aubry Snow was unconscious on appellant's right of way; he became unconscious on the right of way at the place where he was injured "without intention so to do on his part, but due to illness or other cause beyond his control"; and that "while in possession of his mental faculties he did not voluntarily lay down on appellant's right of way prior to his injury." The jury also found that the injuries to the deceased were not the result of an unavoidable accident, and that he was not drunk or under the influence of intoxicating liquor as he lay upon appel-

lant's right of way at the time of his injury. The jury assessed the damages of Mrs. Blannie Snow at $7,500, of each of the minors at $1,400, and of the parents at $500. On the jury's verdict, judgment was entered in favor of appellees for the $15,000, assessed in their favor by the jury, from which appellant has duly prosecuted its appeal to this court.·

Appellant's contention is that the evidence did not raise the excusing circumstances found by the jury in favor of the deceased. We shall analyze these circumstances as brought forward by appellees, and briefed by them under their first counter proposition:

■ (1) The jury was entitled to consider as evidence the presumption "that the deceased exercised ordinary care for his own protection and did not voluntarily place himself in a position of peril." The authorities cited by appellees do not support a presumption that Aubry Snow, a trespasser on appellant's tracks at the time he was injured, was exercising ordinary care for his protection and did not voluntarily place himself in a position of peril. In Missouri, K. & T. Ry. of Texas v. Luten, Tex.Com.App., 228 S.W. 159, 160, the issue was whether the deceased at the time the defendant injured him was a trespasser on its track, or whether he "received his injury while passing across the railroad track on a public road." As a circumstance in favor of the plaintiffs, that the deceased was not a trespasser, the court said that it was proper for the jury to consider "the presumption that the deceased exercised ordinary care for his own protection, and did not voluntarily place himself in a position of peril." In that case the presumption was indulged to establish the issue that the deceased was not a trespasser, and only for that purpose. In the case at bar it is admitted by all parties that the deceased was a trespasser on appellant's railroad track. In Hutcherson v. Amarillo St. Ry. Co., Tex.Com.App., 213 S.W. 931, 933, the issue was whether the deceased went on· top of a certain machine while it was in motion; if in motion the top of the machine was a place of danger. No one saw the deceased at the time of the accident, and the evidence did not show how the accident occurred. On that state of the evidence the court held, as an evidentiary fact to be considered by the jury along with the other evidence, that the

deceased was "entitled to the presumption that he exercised due care for his safety, and that he did not voluntarily and negligently expose himself to danger. This presumption, favorable to the deceased, arises, since the evidence does not account for how the injury occurred, and no one saw him at the time of the accident. It is an element of evidence to be considered by the jury along with the other evidence in arriving at a conclusion on the facts." In that case the issue was whether appellant voluntarily placed himself in a position of danger; in the case at bar it is conceded that the deceased was a trespasser, without any right on appellant's railroad track; in that case the presumption was indulged to relieve the deceased of the imputation of negligence, in the case at bar negligence was established as a matter of law. We think Burton v. Billingsly, Tex.Civ.App., 129 S.W.2d 439, tends to deny appellees' contention; that case is a clear holding that no presumption can be indulged that one guilty of negligence in driving his car at an unlawful rate of speed will reduce his speed to a lawful rate. One Cook, driving at an unlawful rate of speed, struck appellant's automobile, seriously injuring him and damaging his car. The trial court instructed the jury that appellant was guilty of contributory negligence, which holding was sustained by the Court of Civil Appeals. Appellant undertook to drive his car across the street, knowing that Cook was approaching him at an unlawful rate of speed. Appellant testified that he "thought Cook surely would reduce his rate of speed before reaching him." The judgment of the court was that appellant could not lawfully indulge that "thought"—that presumption. Appellees are denied the presumption urged by them on the proposition that since the deceased was a trespasser the burden rested ·on them to establish the existence of excusing circumstances. Texas Traction Co. v. Wiley, Tex.Civ.App., 164 S.W. 1028; Gillette Motor Co. v. Fine, Tex.Civ.App., 131 S.W.2d 817; they could not indulge presumptions of fact in the discharge of this burden.

■ (2) At the time deceased "was struck by appellant's motor car the deceased was lying unconscious on the appellant's right of way." That was not a circumstance neutralizing the negligence of the deceased but was itself the circumstance to be neutralized.

■ (3) There was testimony in the record that the deceased "was lying on the right-hand side of the railroad track with his head on the end of the protruding railroad tie and one hand over the rail." That fact has no evidentiary weight in excusing the negligence of the deceased, but was evidentiary only on the issue whether appellant's servants kept a proper lookout; whether by keeping a proper lookout they would have discovered him in his position on the railroad track.

■ (4) The jury found, and the finding is not attacked by appellant, "that the deceased was sober at such time." And there was testimony in the record "that the deceased suffered from spells of indigestion and heart attacks at which time he would smother and have pains in his chest and go into a sleep or coma from which he could not be aroused," and there was testimony in the record that as "the deceased lay upon appellant's roadbed in the position above referred to, and as appellant's motor car approached him, there was blood upon his head." There was no testimony that the deceased ever suffered a coma from his indigestion, or that his heart attacks ever rendered him incapable of exercising his will. Mrs. Blannie Snow, the wife of the deceased, testified:

"During his life time my husband would have indigestion, sometimes pretty bad; he would smother and have pains in the chest and in the pit of his stomach and in just a while he would go to sleep and sleep two or three hours and you could not arouse him. This would happen sometimes close and sometimes a pretty good piece apart. You would not call my husband a heavy drinking man; he did drink some. He never went to a doctor for medical treatment for his indigestion. I could not tell you how long he had been having these spells; off and on for several years. Sometimes these complaints came immediately after eating; sometimes at the time he was eating. He would then go to bed and sleep them off. He did not become· unconscious right away; he would go to bed and go to sleep. I would not know whether drinking brought on those spells or not. He had had these spells now and then; I don't know just how long he had had them, but he had had a good many of them. The pain would be in his chest and in the pit of his stomach. It would be a more or less acute pain, and if he was at home he would go to bed. Sometimes,

when I could get him to take it, I would give him medicine. As far as I know, he had never been to a doctor."

On the issue of heart attacks suffered by the deceased, Felix Garner testified: "I was with him one Sunday when he had an attack; about a year or better before his death. We were out there spending the Sunday, and we were all sitting around the house and it come dinner time and we went to eat dinner and he never got through eating his dinner, he got up and went outside, he went out toward the barn, and about an hour later I saw him and his brother-in-law out at the car, and I asked him if he was sick and he said 'No' that he just had a little spell with his heart, and I talked to him and after a while he asked his brother-in-law's wife to bring him about a half cup of coffee, and she brought it, and they didn't stay long until he and his wife went home."

Under the testimony, the deceased had walked from Conroe to the place where he was found on the railroad track on his way home. There was no testimony as to when he left Conroe, nor that he had eaten while in Conroe.

About 5:30 or 6 o'clock in the afternoon before the deceased was killed at 8:40, Wayne Binford overtook him about a mile from where he was injured. Binford and the deceased were both on the public highway, travelling in the same direction. He testified to nothing suggesting that the deceased was at that time suffering with a heart attack or with indigestion. We give Binford's testimony, describing his meeting with the deceased:

"Mr. Snow was injured about fifty yards from the railroad crossing; I went down to the place where his body was. His body was down the track about three or four hundred yards from my home. I had seen Mr. Snow earlier in the evening prior to his death; I saw him just on the other side of the bridge; I was going home and he was too; he was this side of the bridge going out, going west. I am referring to the bridge over Alligator branch. He was on this side of the bridge crossing that branch. He was walking; I was on my bicycle; it was about dusk. I had known Mr. Snow a good while prior to that time; we took the paper from him. He was on the south side of the road and I was about the middle. I had a conversation with him; I said to him, 'You have a long ways to go?' and he said, 'Oh, not very far.' That was all

I said. At that time Mr. Snow didn't appear to be drinking; he appeared as always when I saw him before, he was walking straight, as I always saw him walk; he talked like he always did. After our conversation, I rode on. I heard the train whistle at the crossing and I went down there; I had heard something had happened; I saw Mr. Snow at that time. When I saw Mr. Snow at the bridge I guess it was about 5:30 or 6 o'clock; it could have been later; it was dusk dark."

Mr. Alfred Ray testified that he saw Mr. Snow prior to his death on the day he was killed; we give his testimony: "I was acquainted with Mr. Aubry Snow during his life time; had known him practically all my life. I had seen Mr. Snow earlier in the day he was killed; twice I think. The first time I saw him that day was here in town—Conroe—at Mr. Golden's corner; that was about 4 o'clock. I saw him out on highway 105 later in the evening. That road parallels the G. C. & S. F. Railroad track going out of town, I saw him about dusk dark. He was like he always was; his apparent condition was that he was not under the influence of liquor but was sober. He didn't indicate to me that he was under the influence of liquor. I saw him on highway 105 between the bridge on Alligator branch and a filling station. He was walking down the road, I passed him in my car. He walked in a normal straight manner and didn't stagger. I didn't talk to him. The place where I passed Mr. Snow was about four or five hundred yards from the place where he was killed. The railroad track at that place parallels the public road; it runs right along the side of the road."

This evidence rebuts the inference that on the occasion in question the deceased, by reason of indigestion or a heart attack, of the nature suffered by him in the past, became suddenly unconscious; that, because his indigestion immediately followed his meals, and there was nothing about him to suggest that he was about to have an attack of any kind.

The testimony of the wife of the deceased, that after his spells of indigestion or while suffering from the indigestion he would undress and go to bed and go to sleep—all this as a voluntary act on his part—raised the inference against appellees that if the deceased on the occasion in question felt the approach of an attack of indigestion or a heart attack, he did on the

railroad track as he did at home—voluntarily lay down on the track to secure relief, and while on the track went to sleep or became suddenly unconscious.

That there was blood upon the head of the deceased before the train struck him was raised by the evidence. There is nothing in the record explaining this circumstance. The witness T. J. Adams gave the following testimony on the condition of the deceased's head: "I remember when Mr. Aubry Snow met his death on the G. C. & S. F. R. R. tracks. I went to the scene of the accident and there saw Mr. Aubry. His body was near the track. I saw his body at the undertaking establishment when it was being prepared for burial. I saw the wounds on his body; on the right side of the back of his head was a large wound; it was a complete concussion; large enough that you could see the brain at the base of the skull; I would say almost large enough that you could put your foot in it; the brain was exposed."

Mr. Alfred Springer testified that he got off the train after it stopped, saw the body of Mr. Snow; that Mr. Snow was breathing at that time, was gasping for long breaths; "after the train stopped I heard the engineer talking and heard him say that the deceased as the train approached had blood on his head, and was lying there on the rail." J. J. Fuller testified that he heard a conversation between the conductor and the engineer; that he heard the engineer say that it looked like the man had blood on his head before he got to him.

It is our conclusion, on the evidence, that the wound on the head of the deceased, described by the witness Adams, was inflicted by appellant's train. There is no explanation of the blood on the head of the deceased, discovered by the engineer before the train hit him. There is no circumstance in the record raising the inference that this wound was of a nature to render the deceased unconscious. Standing alone, the circumstance that the head of the deceased was bloody before the train hit him, without explanation, cannot support the conclusion that this injury rendered him unconscious, and that because, being a trespasser, the deceased was not entitled to the presumption that, in putting himself in a place of danger, he used due care for his own safety.

■■ The deceased was guilty of contributory negligence, as a matter of law, in being on appellant's track at the time and place he was injured. In our judgment the evidence does not excuse his position on the track, thereby neutralizing his negligence.

■ We think the evidence raised the issue that the operators of appellant's train on the occasion in question failed to keep a proper lookout.

On oral argument, counsel for appellees stated to the court that they were not in position to concede that all the evidence had been developed on the issues we have discussed. In answer to questions from the court, counsel stated that, if we should conclude that the evidence did not raise the issue of the existence of the excusing circumstances, they wanted the case remanded for another trial.

Appellant has other assignments which can be obviated on another trial. From what we have said it follows that the judgment of the lower court should be reversed and the cause remanded, and it is accordingly so ordered.

Reversed and remanded.

### On Rehearing.

■ Appellant assigns error against our order reversing and remanding this case for a new trial; the point is made that the judgment should be rendered in its favor. The assignment is overruled. There is no explanation of the fact that the deceased's head was bloody at the time appellant's engineer first discovered him lying on the track. We cannot anticipate the evidence on another trial. On this proposition, in Texas Employers' Ins. Ass'n v. Herring, 280 S.W. 740, 741, the Commission of Appeals, citing many supporting cases, said:

"We must reverse this case because of the failure of evidence in the respect mentioned. It must be either remanded or rendered for plaintiff in error. Since it does not conclusively appear that the case has been fully developed on the former trial, we have decided that justice may be better subserved by a remand of the case."

See also Fort Worth & D. C. Railway Company v. Atkinson, Tex.Civ.App., 254 S.W. 1028; Chapman v. Witt, Tex.Civ. App., 285 S.W. 331; Dunlap v. Squires, Tex.Civ.App., 186 S.W. 843; Conoway v. Morrow, Tex.Civ.App., 147 S.W. 344; Allen v. Anderson & Anderson, Tex.Civ.App., 96 S.W. 54; Starkey v. H. O. Wooten Grocery Co. et al., Tex.Civ.App., 143 S.W. 692. In support of its proposition that the judgment should be rendered, appellant cites

the opinion by this court in Texas & N. O. R. Co. v. Beard, Tex.Civ.App., 91 S.W. 2d 1080, 1081. That case is not in point; there it affirmatively appeared that appellees had fully exhausted their testimony. The case at bar, as shown by our opinion, was tried on the wrong theory of the law, and we cannot say that the evidence has been exhausted. Appellees tried this case on the theory that they were entitled to the presumption that the deceased was not guilty of negligence. It is our conclusion that on the particular facts of this case appellees cannot invoke that presumption. Appellant's motion for rehearing is overruled.

We have again reviewed carefully our conclusions as expressed in the original opinion. Appellees' motion for rehearing is overruled.