236 So.2d 393 (1970)
GULF, MOBILE & OHIO RAILROAD COMPANY and E.H. Swetman
v.
Wilda Raye HOLLINGSHEAD, Individually and as Mother and Next Friend of James Arlie Hollingshead.
No. 45850.
Supreme Court of Mississippi.
June 8, 1970.
*394 W.S. Murphy, Lucedale, Fred B. Smith, Ripley, Percy W. Johnston, Jr., Mobile, Ala., for appellants.
Cumbest, Cumbest & Shaddock, Pascagoula, for appellee.
ETHRIDGE, Chief Justice.
Wilda Raye Hollingshead, individually and as mother and next friend of James Arlie Hollingshead, a minor, brought this action in the Circuit Court of George County against appellants-defendants, the Gulf, Mobile & Ohio Railroad Company and E.H. Swetman, engineer of its train, for the alleged wrongful death of James Louis Hollingshead, husband and father respectively of the plaintiffs. The jury returned a verdict for plaintiffs, upon which the trial court entered its judgment. However, we conclude that there was no issue to be submitted to the jury, and thus reverse and render judgment here for appellants.
On the day of the accident, November 27, 1965, James Louis Hollingshead was twenty-one years of age, married; and his wife was pregnant with child. For two days previously he and three friends had been hunting deer. Hollingshead left home around four a.m. on the morning in question, and he and his friends again engaged in hunting deer, using G.M. & O.'s trestles as "stands" for that purpose. Around noon, G.M. & O. extra train 603, southbound from Laurel to Mobile, was proceeding through a wooded area in George County. The train was "drifting" on a slight downgrade at a speed of about thirty miles an hour when it went into a curve, and as it came out of the curve, its speed was between twenty-eight to thirty miles per hour. When the lead locomotive reached a point 900 feet north of railroad trestle 52.4 in the Pascagoula River swamp, the engineer, Swetman, and fireman, Fred Thompson, observed an unidentified object near the middle of the trestle, between the west steel rail and the wooden guard-rail. An emergency application of the brakes was made immediately upon their ascertaining that the object was a human, lying prone and unmoving in that position. This point was approximately 600 feet from the place where the decedent was located. Immediately upon applying emergency brakes, the engineer sounded and continued to sound warning whistles. The long train was making a loud rumbling noise as it proceeded over the tracks. Yet the prone Hollingshead never moved. Before the *395 emergency brakes stopped the train, three locomotives and twelve box cars passed the point on the trestle where the body was seen, killing Hollingshead.
Train 603 consisted of three General Motors, GP-35 locomotives of 2500 HP each, coupled to 106 freight cars, of which 94 were loaded, and 12 empty. The train weighed 9,834 trailing tons and 386 locomotive tons, or an aggregate of 10,220 tons. Its overall length was 4,945 feet. The braking system of the train had been inspected, checked, and found to be in good working order before its departure from Laurel. Although the whistle was sounded during the entire 600 feet the train approached the prone Hollingshead and the train made a loud noise on the tracks with emergency brakes applied, Hollingshead gave no indication that he heard the oncoming behemoth. There is no positive proof that he was living, although one of his hunting companions saw him walking toward trestle 52.4 about eleven a.m. The rumble of the train on the tracks and the whistle were heard by the three other members of decedent's hunting party, who were some distance away.
Hollingshead was a trespasser on the railroad trestle. It is settled in this State that the servants of a railroad company in charge of its train are under no duty to keep a lookout for trespassers on the railroad track, and are required only to exercise reasonable care to prevent injuring a trespasser after they have discovered and realized his peril. Dickerson v. Illinois C.R.R., 244 Miss. 733, 145 So.2d 913 (1962). The test of responsibility arises when the engineer becomes aware of the presence and peril of the trespasser. Illinois C.R.R. v. Ash, 128 Miss. 410, 91 So. 31 (1922); Louisville, N.O. & T. Ry. v. Williams, 69 Miss. 631, 12 So. 957 (1892). Until made aware of the presence and peril of the trespasser, "there could not be wilful negligence or wanton misconduct toward an unrecognized, undiscerned trespasser." Louisville, N.O. & T. Ry. v. Williams, 69 Miss. 631, 641, 12 So. 957 (1892).
The circuit court properly gave peremptory instructions for the defendants on the following allegations made by plaintiff: (1) negligent failure to keep a reasonable and proper lookout; (2) negligent failure to see that which the engineer should have seen; (3) negligent failure to give adequate and timely warnings, by whistle, horn, or otherwise, of the approach of the train; (4) negligent use of defective braking equipment.
The sole issue submitted to the jury by the court was whether the engineer failed to exercise ordinary and reasonable care to stop the train before striking Hollingshead, after the engineer recognized the object on the trestle as a human; or, stated differently, after the engineer recognized the object as a human, whether the train was then "a sufficient distance (for the engineer) to be able to stop said train by the exercise of ordinary and reasonable care before striking" Hollingshead.
Was there sufficient evidence to make an issue for the jury on whether Engineer Swetman, after identifying the object on the trestle as a human, could in the exercise of reasonable care have stopped the train before it reached Hollingshead? We conclude that the uncontradicted evidence of any probative value requires a negative answer, namely, that the train simply could not have been stopped before it hit plaintiffs' decedent.
Swetman put on the emergency brakes of the train at 600 feet from decedent, and, he said, the train finally stopped 400-500 feet down the track from the point of impact, a total of 1000-1100 feet from the point of application of emergency brakes. There is no dispute in the evidence as to the actions of the engineer when he discovered that the object on the trestle was a human being, and that was that he did everything he possibly could do to stop the train. This was confirmed by the fireman, *396 Thompson, who was only a few feet away. The credibility of these witnesses has in no way been attacked. Moreover, upon applying the emergency brakes, the engineer immediately began to blow the whistle, many times, and continued to blow it until the body was passed. Nor is there any evidence that the engineer or fireman could have recognized the object lying prone between the rails and the trestle guardrails as a human being more than 600 feet away.
F.J. Wright, a traveling engineer for another railroad, of many years experience and training, particularly with air brakes, discussed in knowledgeable detail the emergency application of air brakes on a train of the size and weight of No. 603. He said there would be a time lag of approximately nine seconds between the times the valve was opened and the brakes would begin to apply. In this time span, the train would travel 396 feet before its speed would begin to be retarded. He estimated that the train travelled 1,316 feet from the point where the emergency application of brakes was made to where it stopped. Wright thought that this was a good, minimal stop. Clifford A. Kifer, another witness for defendant, is an electrical engineer and an employee of Westinghouse Air Brakes Company. His specialty involves engineering problems on trains, with particular reference to their brake systems. Kifer testified that on a 106 car train, 5.5 seconds would elapse after application of brakes before they became effective. With cylinder pressure considered, the total time lag would be around 9 seconds. On a hypothetical question, the witness stated that it would take approximately 1200 feet for a train of this size and speed to come to an emergency stop, not including the engineer's reaction time. The greater the weight of the train the longer it would take to stop it, since there would be more kinetic energy to be arrested.
We do not think that the testimony of the two train engineers who testified for plaintiffs, Cirlot and Alford, made a jury issue on whether the train could have been stopped within 600 feet in the exercise of reasonable care by Engineer Swetman. In the first place, it is doubtful that Cirlot and Alford were competent to testify as expert witnesses. Generally to qualify as an expert witness, one must have acquired special knowledge of the subject matter about which he is to testify, either by the study of recognized authorities on the subject or by practical experience. 31 Am.Jur.2d Expert and Opinion Evidence § 105 (1967). Further, an expert witness testifying about the stopping distance of a train should have experience in the testing or operation of trains of essentially similar size, construction, and equipment, under like circumstances. Wade v. Chesapeake & O. Ry., 169 Va. 448, 193 S.E. 491 (1937). The question of whether the opinion of an asserted expert witness is based upon and supported by facts and similarities of experience sufficient to sustain it, is a question of law for the court. Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844 (1953); Grotjan v. Thompson, 140 S.W.2d 706 (Mo. Ct. App. 1940).
Secondly, assuming that the trial court did not err in permitting these two witnesses to testify as experts, their testimony constitutes at most no more than a scintilla of evidence based solely on hypothetical questions, in unsupported contradiction of the undisputed evidence by the engineer and fireman and defendants' two qualified expert witnesses.
Neither Cirlot nor Alford was familiar with the track, its grade, or its location. They had never viewed the scene of the accident. Each had had his total train engineering experience on a short line railroad which had a speed limit of 20 miles per hour. Cirlot had never operated a train with more than one locomotive, nor a train with even one locomotive with the 2500 HP possessed by each of the locomotives on appellants' train. He had not operated any train in nine years. Alford had never operated a train with more than two locomotives and none of them with the *397 large horsepower of the train involved in this accident. Neither Cirlot nor Alford had ever operated a train with 106 cars, 94 of which were loaded, or any train with an overall weight of 10,220 tons and a length of 4,945 feet. Neither of them knew about the tonnage of any trains they had pulled. In fact, both were of the opinion that the weight of the train did not make much, if any, difference in the stopping distance. Yet it is a matter of common knowledge that weight is a very significant factor affecting the time of stopping a train. Cobb v. Texas & N.O.R.R., 107 S.W.2d 670 (Tex.Civ.App. 1937). Neither witness had any training in or knowledge of the technical construction or operation of air brakes. For example, they were of the erroneous opinion that immediately upon application of emergency brakes, they took effect back to the last car of the train. Cirlot erroneously said that upon application of emergency brakes, the brakes on the last car of the train applied first, and then in succession toward the front of the train. Both of them only had experience on a railroad with a different size and weight of rails. Neither knew the grade of tracks of the shortline railroad over which they had operated, or the effect of grade on stopping distance. Cirlot admitted that he was not an expert on air brakes and stopping time.
The weight of expert opinion testimony depends largely upon its basis, the competence and knowledge of the witness and the opportunity which the witness has had for observation of similar facts and circumstances. The opinion of an expert may be reduced to mere conjecture by proof of physical facts completely inconsistent with his opinion. 31 Am.Jur.2d Expert and Opinion Evidence § 181 (1967). For example, a witness testifying about the market value of a tract of land, who is not familiar with the land and knows of no comparable sales, bases his opinion on conjecture and surmise and is not qualified as an expert witness. Mississippi Power Co. v. Walters, 204 So.2d 471 (Miss. 1967); Mississippi State Highway Comm'n. v. Ramsey, 253 Miss. 747, 179 So.2d 267 (1965); Mississippi State Highway Comm'n. v. Ratcliffe, 251 Miss. 785, 171 So.2d 356 (1965). These same limitations on the competency and value of opinion testimony have been applied by other jurisdictions in cases involving air brakes and the stopping distances of trains. Thompson v. Chicago & E. III. R.R., 32 Ill. App.2d 397, 178 N.E.2d 151 (1961); Texas & N.O.R.R. v. Grace, 144 Tex. 71, 188 S.W.2d 378 (1945); Grotjan v. Thompson, 140 S.W.2d 706 (Mo. Ct. App. 1940); Cobb v. Texas & N.O.R.R., 107 S.W.2d 670 (Tex. Civ.App. 1937); Wade v. Chesapeake & O. Ry., 169 Va. 448, 193 S.E. 491 (1937); Genzel v. New York, C. & St. L.R.R., 249 Ill. App. 164 (1928); Wise Terminal Co. v. McCormick, 104 Va. 400, 51 S.E. 731 (1905); Richmond Passenger & Power Co. v. Rack's Adm'r., 101 Va. 487, 44 S.E. 709 (1903). Mississippi Central Railroad Co. v. Aultman, 173 Miss. 622, 160 So. 737 (1935), is not in point. There a passenger train ran into a school bus on a crossing. The opinion noted that the locomotive engineers who testified had had experience operating locomotives of the character of the one involved in the accident, were familiar with surrounding conditions, and had had experience under similar circumstances.
In summary, no issue of fact existed for the jury to determine. There was no contradiction of the testimony of the engineer and fireman that, as soon as they could determine that the object on the trestle was a human being, the emergency brakes were immediately applied and the whistle sounded. The record reflects that the engineer did everything he could to avoid hitting Hollingshead, but that it was impossible to avoid the collision.
Reversed and judgment rendered here for appellants.
JONES, PATTERSON, INZER and ROBERTSON, JJ., concur.